FILED

2023 Sep-11  AM 11:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **In re Redistricting 2023** | **Misc. No.: 2:23-mc-1181-AMM**<br>**Three-Judge Court** |

### *SINGLETON* PLAINTIFFS' PROPOSED REMEDIAL PLAN

The *Singleton* Plaintiffs respectfully submit a proposed remedial plan pursuant to the Court's order permitting them to "submit remedial maps for the Special Master to consider and to otherwise participate in proceedings before the Special Master to the same degree as the *Milligan* and *Caster* Plaintiffs," *Singleton v. Allen*, No. 2:21-cv-1291-AMM (N.D. Ala.), ECF No. 154 at 5.[1]

### I.    Reconciling the Requirements of the Voting Rights Act with the Supreme Court's Equal Protection Jurisprudence

It has been widely assumed in the press that the rulings of the District Court and the Supreme Court require the Special Master to recommend remedial plans that contain one or more majority-Black districts. That is not correct.

The Special Master's instructions say that the remedies he recommends for the VRA violation "shall 'include[] either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice.'" ECF No. 192 at 7 (quoting

---

[1] Citations to "ECF No." refer to filings in *Singleton* unless otherwise noted.

*Milligan v. Allen*, No. 21-cv-1530-AMM (N.D. Ala.), ECF No. 107 at 5 (2022 Preliminary Injunction)). The instructions also say that the remedies must "[c]omply with the U.S. Constitution." *Id.* The quoted paragraph in the 2022 Preliminary Injunction relies on precedents that include *Cooper v. Harris*, 581 U.S. 285 (2017), and *North Carolina v. Covington*, 138 S. Ct. 2548 (2018). These two cases, along with *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245 (2022), and *Abbott v. Perez*, 138 S. Ct. 2305 (2018), require the Special Master, before he considers any plan designed to produce districts with a Black majority or other desired percentage, to conduct a careful analysis of whether plans can be drawn that provide two opportunity districts without drawing race-based lines.

In *Cooper v. Harris*, the Supreme Court held that establishing a "racial target" to make Black voters "no less than a majority of the voting-age population" was unconstitutional if there had been no "meaningful legislative inquiry" into whether Section 2 of the Voting Rights Act could be satisfied by districts "created without a focus on race." 581 U.S. at 303. "To have a strong basis in evidence to conclude that § 2 demands such race-based steps, the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting—in a new district created without those measures. We see nothing in the legislative record that fits that description." *Id.* at 304 (footnote omitted); *accord North Carolina v. Covington*, 138 S. Ct. at 2550 ("A group of plaintiff voters,

appellees here, alleged that the General Assembly racially gerrymandered their districts when—in an ostensible effort to comply with the requirements of the Voting Rights Act of 1965—it drew 28 State Senate and State House of Representatives districts comprising majorities of black voters. The District Court granted judgment to the plaintiffs, and we summarily affirmed that judgment.") (citation omitted); *Abbott*, 138 S. Ct. at 2335 ("Here, Texas has pointed to no actual 'legislative inquiry' that would establish the need for its manipulation of the racial makeup of the district.").

The Supreme Court reiterated this holding in the context of a court-ordered plan in *Wisconsin Legislature v. Wisconsin Elections Commission*. When the legislative process failed to produce a constitutional map for Wisconsin's House and Senate districts, the Wisconsin Supreme Court invited the submission of plans "that complied with the State Constitution, the Federal Constitution, and the Voting Rights Act." 142 S. Ct. at 1247. The Governor submitted a plan that intentionally increased the number of Milwaukee-area majority-Black districts from six to seven, and there was no dispute that those districts were "reasonably configured" within the meaning of the first *Gingles* precondition. *Johnson v. Wisconsin Elections Commission*, 971 N.W.2d 402, 416 (Wis. 2022). The U.S. Supreme Court *summarily* reversed, faulting the Wisconsin Supreme Court for failing adequately to conduct the analysis required by *Cooper v. Harris*. 142 S. Ct. at 1250. "The question that our

VRA precedents ask and the court failed to answer is whether a race-neutral alternative that did not add a seventh majority-black district would deny black voters equal political opportunity. Answering that question requires an intensely local appraisal of the challenged district." *Id.* at 1250–51 (citing *LULAC v. Perry*, 548 U.S. 399, 437 (2006)) (cleaned up).

Here, the Supreme Court has affirmed the District Court's judgment that Alabama's failure to provide two effective opportunity districts violates Section 2, but it never purported to alter its holdings in *Cooper*, *Abbott*, *Covington*, or *Wisconsin Legislature*, or to relax the standards that apply to remedial plans.[2] The only question is whether the District Court can adopt a plan that segregates voters by race when the *Singleton* Plaintiffs have presented strong evidence that crossover districts will satisfy the VRA without drawing race-based lines. Whether it is a legislature or a court drawing the map, it must conduct a careful inquiry into the

---

[2] In affirming the District Court's liability ruling, the Supreme Court made clear that its finding that race did not predominate in the plaintiffs' illustrative plans was solely for the purpose of satisfying the first *Gingles* precondition. "For all those maps were created with an express target in mind—they were created to show, as our cases require, that an additional majority-minority district could be drawn. That is the whole point of the enterprise. ... [The plaintiffs] were required to do no more to satisfy the first step of *Gingles*." *Allen v. Milligan*, 143 S. Ct. 1487, 1512 (2023). The Supreme Court's only reference to a remedy was to affirm that "race-based redistricting" was permissible "under certain circumstances." *Id.* at 1516–17 (citation omitted). And the majority's concluding paragraph made clear that its opinion affirming liability should not be read as diminishing the concern that "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters." *Id.* at 1517 (quoting *Shaw v. Reno*, 509 U.S. 630, 657 (1993)).

availability of race-neutral districts that would satisfy the VRA before drawing

districts with a majority-Black target. *Wisconsin*, 142 S. Ct. at 1250.

## II.     The Special Master's Assignment

The Court has ordered the Special Master to propose three remedial plans that

do the following:

1. Remedy the State's likely Section 2 violation by including either an

additional majority-Black congressional district, or an additional district in which

Black voters otherwise have an opportunity to elect a representative of their choice.[3]

2. Comply with the U.S. Constitution and the Voting Rights Act.

3. Comply with the one-person, one-vote principle guaranteed by the Equal

Protection Clause.

4. Respect traditional redistricting principles to the extent practicable. These

principles include compactness, contiguity, respect for political subdivisions, and

maintenance of communities of interest. The Special Master may not consider

incumbency protection or political affiliation.

ECF No. 192 at 7–9.

---

[3] At times, the Court has predicted (but *not* held) that, based on evidence of polarized voting, "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." ECF No. 88 at 5. That prediction may be true in most of the state, but it is incorrect in Jefferson County, where significant crossover voting allows Black voters to elect candidates of their choice even though only 41.5% of the Voting Age Population is Black. *See infra* Part III.A. In any event, the Court did not include the "voting-age majority or something quite close to it" language in its order setting out the Special Master's assignment; it is not one of the Court's criteria for the Special Master's plans. ECF No. 192.

The *Singleton* Plaintiffs submit a plan that passes all these requirements with flying colors. It was drawn without segregating voters by race, yet it provides the opportunities that Section 2 requires, and it preserves political subdivisions and communities of interest better than any plans that the *Singleton* Plaintiffs have seen during the two years this litigation has been pending.

### III.   The Singleton Plan Meets All of the Court's Criteria Without Drawing Race-Based Lines.

Plaintiff Bobby Singleton is a member of the Alabama State Senate. During the 2023 special legislative session, he submitted a plan designed to comply with the Court's holding that a remedial plan must contain two opportunity districts (the "Singleton Plan").[4] The Singleton Plan was originally proposed by the nonpartisan Campaign Legal Center in an *amicus* brief in the Supreme Court appeals of *Milligan* and *Caster*. This plan preserves three of the districts in the enacted 2021 Plan without changes: District 1 in the Gulf region, and Districts 4 and 5 in northern Alabama. The other districts are reconfigured to equalize population and to respect political subdivisions and communities of interest to the extent possible, while still providing Black voters the opportunity to elect candidates of their choice in two districts. The

---

[4] Plaintiff Rodger Smitherman, who is also a member of the Senate, submitted another plan designed to keep counties whole to the extent possible and create two opportunity districts without drawing race-based lines. The *Singleton* Plaintiffs believe that this is an excellent plan as well, and they have provided block equivalency files and previous election returns for that plan for the Special Master's information. But the *Singleton* Plaintiffs have chosen the Singleton Plan as their primary remedial plan.

two opportunity districts are District 6, whose BVAP is 39.61% and which includes all of Jefferson County and just enough of northern Shelby County to equalize population, and District 7, whose BVAP is 49.38% and which includes nearly all of the Black Belt. District 2 includes the Wiregrass region, and District 3 covers the counties east and south of Jefferson County. No district lines separate voters by race.



The Singleton Plan Satisfies every requirement the Court has laid out.[5]

### A.   The Singleton Plan Remedies the Section 2 Violation.

Remedying a violation of Section 2 does *not* necessarily require the creation of a majority-minority district. In any districting plan, Section 2 is not violated if the racial minority stays in the minority but attracts enough "crossover" votes to elect

---

[5] The *Singleton* Plaintiffs have uploaded a block equivalency file for the Singleton Plan to the Special Master's data repository.

the candidate of its choice. *Cooper v. Harris*, 581 U.S. at 303. In such a district, members of the racial minority need not have a guarantee—only a realistic equal opportunity to the elect the candidate of their choice. 52. U.S.C. § 10301(b) (Voting Rights Act is violated if the members of the minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice"); *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994) ("[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.").

As the United States explained when it filed a statement of interest in this case, "district courts often assess whether a given plan provides minority voters with an opportunity to elect candidates of their choice based on analyses of the relevant districts' performance." ECF No. 152 at 9. This assessment typically involves "'reconstituted' or 'recompiled' exogenous election analyses," which evaluate how many voters in the proposed district voted for candidates of each party in races other than those for U.S. Representative. *Id.* at 12 (footnote omitted). This analysis is possible for statewide races because the Secretary of State keeps records of votes in these elections at both the county and precinct level. Here, if the preferred candidates

of Black voters have at least equal success in attracting votes as their opponents in a proposed district, then that district is an opportunity district.[6]

The preferred candidates of Black voters have had more than equal success in the two opportunity districts in the Singleton Plan. Using the Secretary of State's data, the *Singleton* Plaintiffs have tabulated the results of every statewide election contested by a Democrat and a Republican since 2012 in the Singleton Plan's opportunity districts, as the following tables show.[7] Races in which the Democrat was Black and the Republican was White are marked with an asterisk.

---

[6] To "[c]ompletely remedy" the Section 2 violation, as the Court directed, ECF No. 192 at 7, does not require that the preferred candidates of Black voters get more votes in every election; equality of opportunity is a complete remedy. *United States v. Dallas County Commission*, 850 F.2d 1433, 1438 (11th Cir. 1988) (district courts must "fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice") (citation omitted), *vacated on other grounds*, 220 F.3d 1297 (11th Cir. 2000).

[7] Since at least 2012, the Democratic candidate has been the preferred candidate of Black voters.

| | Party of candidate with the most votes | |
|---|---|---|
| Race | Jefferson County District | Black Belt District |
| 2012 President* | Democrat | Democrat |
| 2012 Chief Justice | Democrat | Democrat |
| 2014 Governor | Republican | Democrat |
| 2014 Lieutenant Governor* | Republican | Democrat |
| 2014 Commissioner of Agriculture and Industries | Republican | Democrat |
| 2014 Attorney General | Democrat | Democrat |
| 2014 Secretary of State* | Republican | Democrat |
| 2014 Auditor* | Republican | Democrat |
| 2016 President | Democrat | Democrat |
| 2016 Senate | Democrat | Democrat |
| 2017 Senate | Democrat | Democrat |
| 2018 Governor | Democrat | Democrat |
| 2018 Lieutenant Governor* | Democrat | Democrat |
| 2018 Attorney General | Democrat | Democrat |
| 2018 Secretary of State | Democrat | Democrat |
| 2018 Auditor* | Democrat | Democrat |
| 2018 Chief Justice | Democrat | Democrat |
| 2018 Associate Justice | Democrat | Democrat |
| 2018 PSC Place 1* | Democrat | Democrat |
| 2018 PSC Place 2 | Democrat | Democrat |
| 2020 President | Democrat | Democrat |
| 2020 Senate | Democrat | Democrat |
| 2020 PSC President | Democrat | Democrat |
| 2022 Senate* | Democrat | Democrat |
| 2022 Governor* | Republican | Democrat |
| 2022 Attorney General* | Democrat | Democrat |
| 2022 Secretary of State* | Democrat | Democrat |
| 2022 Associate Justice* | Democrat | Democrat |

Under the Singleton Plan, the Democratic candidate received more votes than his or her opponent in 22 of the 28 races in the Jefferson County district (79%), and in 28 of 28 races in the Black Belt district (100%). Although this analysis properly focuses on Black-preferred candidates, not Black candidates, most Black candidates

received more votes than their opponents: 8 of 12 in the Jefferson County district (67%), and 12 of 12 in the Black Belt District (100%).[8]

It is even likely that these figures understate the opportunity for the preferred candidates of Black voters. Other than Doug Jones, no Democrat has been elected to statewide office in Alabama since 2002. There is little incentive for talented Democrats to enter statewide races because defeat is virtually certain, and there is little incentive for donors to spend money on a losing campaign. On the Republican side, the incentive to run is high because the winner of the primary is virtually certain to win the general election. As a result, the typical race involves a relatively unknown and underfunded Democratic candidate against a better-funded, better-known, and often incumbent Republican candidate. For example, in 2022 political newcomer Yolanda Flowers took on Kay Ivey, one of the most popular incumbent governors in the country, and was outspent 850 to 1. Although Ms. Flowers lost statewide, she received more votes in the Singleton Plan's Black Belt district, and she came close in the Jefferson County district (49.1% of the two-party vote). In a congressional race under the Singleton Plan, however, talented Democratic candidates would be attracted to a winnable race, and they would be well funded because the race would matter for the balance of power of the House of

---

[8] The Defendants admitted that these results were accurate. ECF No. 180-1 at 5. The *Singleton* Plaintiffs have uploaded spreadsheets showing their tabulations to the Special Master's data repository.

Representatives. Therefore, these candidates should perform better than candidates for statewide office.

The incumbent Representative for Alabama's only majority-Black district, Terri Sewell, illustrates the potential for congressional candidates to perform better than statewide candidates, and better than the district's demographics would suggest. With no political experience, Representative Sewell ran for the first time in 2010, which turned out to be the worst election for Democratic House candidates since 1946. Nevertheless, she won 72.4% of the vote in a district whose BVAP was 59.75%, outperforming the district's BVAP by 12.6 percentage points. ECF No. 84 at 18. Even in the Jefferson County district in the Singleton Plan, which has 39.6% BVAP, a candidate who outperforms the district's BVAP by the same margin would still win by more than four percentage points. The *Singleton* Plaintiffs are aware of no data suggesting that their proposed opportunity districts would fail to perform as intended most of the time.

Recent countywide election returns in Jefferson County provide further assurance that a district comprised of 94% Jefferson County residents and 6% Shelby County residents (as in the Singleton Plan) will give Black voters the opportunity to elect the candidates of their choice. The following table summarizes the official results of elections of statewide and countywide offices in Jefferson County from 2008 to 2022. This summary includes the Jefferson County Circuit and District

Court Judges, District Attorney, Circuit Clerk, Treasurer, Tax Assessor, Tax Collector, and Judge of Probate offices, in which one is elected from the Birmingham Division and another from the Bessemer Division.

| Page numbers in ECF No. 171-5 | Number of wins by Democratic candidates | Number of losses by Democratic candidates |
|---|---|---|
| 16-19: 2022 returns | 25 | 0 |
| 27-29: 2020 returns | 15 | 0 |
| 30-34: 2018 returns | 33 | 0 |
| 35: 2017 returns | 1 | 0 |
| 36-39: 2016 returns | 25 | 0 |
| 40-43: 2014 returns | 10 | 5 |
| 51-54: 2012 returns | 25 | 0 |
| 55-60: 2010 returns | 26 | 11 |
| 61-66: 2008 returns | 16 | 1 |

Although some Democratic candidates had difficulties in 2010 and 2014, Democrats have not lost an election in Jefferson County since, a streak of 99 consecutive elections. Although the eight relatively Republican precincts in Shelby County in the Singleton Plan could have affected these results if their voters had participated in these elections, the message is clear: even though Jefferson County's BVAP is only 41.5%, it has more than enough crossover support to elect the preferred candidates of Black voters.

**B.     The Singleton Plan Complies with the U.S. Constitution and the Voting Rights Act.**

As described above, the Singleton Plan completely remedies the violation of Section Two, and therefore complies with the Voting Rights Act. It also complies with the U.S. Constitution because it does not separate voters by race. *See supra* Part I. Because the Singleton Plan does not draw any lines based on race, adopting it (or something like it) would sidestep the serious constitutional issues that would arise from adopting a plan that uses race to draw districts even though a race-neutral alternative creates equal political opportunity.

**C.     The Singleton Plan Complies with the One-Person, One-Vote Principle.**

In the Singleton Plan, the difference in population between the largest and smallest districts is one person, which is the minimum possible. Therefore, it complies with the one-person, one-vote principle.

**D.     The Singleton Plan Follows Traditional Redistricting Principles.**

The Court has accurately summarized Alabama's traditional redistricting principles as follows: "compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest." ECF No. 192 at 9. The Reapportionment Committee's redistricting guidelines and the findings of fact in the 2023 Plan cover more principles, but they either have been covered above (e.g., compliance with the Voting Rights Act), or the Special Master may not consider

them (e.g., protecting incumbents). *See* ECF No. 191 at 199–205 (findings of fact),

211–217 (redistricting guidelines). The Singleton Plan performs well on all of these

principles.

*Compactness*

The Singleton Plan is reasonably compact. The following table compares its

Reock and Polsby-Popper scores to the enacted 2011 Plan, which was compact

enough to be acceptable to the Alabama Legislature. (Higher scores are better.)

| Plan | Reock | Polsby-Popper |
|------|-------|---------------|
| Singleton Plan | 0.3869 | 0.2266 |
| 2011 Plan | 0.3848 | 0.1897 |

By either measure, the Singleton Plan is more compact than the last enacted plan

that was not enjoined by the Court.

*Contiguity*

The Singleton Plan is contiguous.

*Respect for Political Subdivisions*

Counties have long been the building blocks for Alabama's congressional

districts, and they are integral to the political and civic life of Alabama. Elections

are administered at the county level, and the Secretary of State reports results at the

county level as well. Alabamians elect county sheriffs, county commissioners,

county judges, county tax collectors, county tax assessors, and county boards of

education. Political parties organize at the county level. Counties cluster individuals

around a sense of community, and ordinary citizens identify themselves by the county in which they reside. ECF No. 189 at 23. Before 1992, only two counties had ever been split (Jefferson and St. Clair), and then only because Jefferson County's population was too large for one district. Since the 2010 census, Jefferson County's population has fallen below the size of an ideal district, and districts of equal size can be drawn—and should be drawn—by making fairly minor splits to just six counties, the minimum number possible.

The Singleton Plan does just that. Unlike the State's last few enacted plans, which separated hundreds of thousands of Alabamians from each other within the same county, the Singleton Plan reduces splits to a level not seen since 1992. To the extent possible, its county splits respect the Legislature's choices: it adopts the 2021 Plan's splits of Escambia, Lauderdale, and Tuscaloosa Counties. By reuniting Jefferson and Montgomery Counties, however, it dramatically reduces the number of Alabamians affected by a split.

The Singleton Plan also respects municipalities: it leaves intact what are by far the four largest cities in Alabama: Huntsville, Montgomery, Mobile, and Birmingham.[9] No congressional plan has achieved this since at least 1992.

---

[9] Birmingham is irregularly shaped and crosses the border of Shelby County at multiple locations. It is possible that a *de minimis* portion of Birmingham in Shelby County is not included in the Jefferson/Shelby district.

*Maintenance of Communities of Interest*

During this litigation, the parties have cited four communities of interest: the Black Belt, Jefferson County, the Gulf Coast, and the Wiregrass. The Singleton Plan does an excellent job of preserving the integrity of these communities of interest.

Black Belt: The parties to this case have essentially agreed that the Black Belt contains eighteen "core" counties.[10] The Singleton Plan keeps sixteen of these counties together in one district, which is the maximum possible number.[11] One of the two counties not included in the Black Belt district, Barbour County, is also listed in the 2023 Plan as a Wiregrass County; the Singleton Plan puts it in the Wiregrass district. The other, Russell County, is associated more with Lee County and Columbus, Georgia, than it is with the rest of the Black Belt.

Jefferson County: Since industrialization, Jefferson County has been one of the most important communities of interest in Alabama.[12] Until the administration of George Wallace, Jefferson County had been kept whole in every congressional

---

[10] The Defendants stipulated in *Milligan* that "[t]he Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox." No. 21-cv-1530-AMM, ECF No. 53 ¶ 61.

[11] If seventeen or eighteen counties were in a single district, they would cut off about a million people in southern Alabama, making it impossible to comply with the one-person, one-vote principle because an ideal district contains 717,754 people.

[12] For historical background on the importance of Jefferson County to Alabama politics, see *Lynch by Lynch v. Alabama*, 2011 WL 13186739, at *30 *et seq.*, *43 et seq. (N.D. Ala. Nov. 7, 2011), *aff'd in part, vacated in part, and remanded sub nom. I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014); *Knight v. Alabama*, 787 F. Supp. 1030, 1090 (N.D. Ala. 1991), *aff'd in part, vacated in part, and rev'd in part*, 14 F.3d 1534 (11th Cir. 1994).

plan since Alabama's statehood in 1819. Since 1992, the relatively urban portion of Jefferson County has had to share a district with much of the rural Black Belt, to the detriment of both communities of Interest. As Senator Singleton explained at the evidentiary hearing last month, having one person represent both urban Birmingham and the rural Black Belt in Congress prevents that person from being a truly effective advocate for either one. 8/15/23 Tr. at 41–43. The Singleton Plan creates separate districts for Jefferson County and the Black Belt, ensuring focused representation for both.

A plan that splits Jefferson County along racial lines, on the other hand, would reinforce the perception that in Alabama, the Democratic Party is for Black people and the Republican Party is for White people. This harmful stereotype will prevent people from coming together across racial lines to elect their leaders and address their common issues.

Gulf Coast and Wiregrass: The *Singleton* Plaintiffs take no position on whether the Gulf Coast and Wiregrass are communities of interest that ought to be preserved in a remedial plan. But even if they are, the Singleton Plan respects these communities. As defined by the Legislature, the Gulf Coast community of interest consists of Mobile and Baldwin Counties. Both are in the same district in the Singleton Plan. Act 2023-563 (the 2023 Plan) defines the Wiregrass as Barbour, Coffee, Covington, Crenshaw, Dale, Geneva, Henry, Houston, and Pike Counties.

The Singleton Plan keeps all of these counties together in a Wiregrass-focused district, except for Crenshaw and Pike Counties, which are also in the Black Belt community of interest and are placed in the Black Belt district.

In sum, the Singleton Plan keeps all residents of every county, except for Russell County, together with their communities of interest.

## IV.    Conclusion

The Singleton Plan does everything the Court has asked of a remedial plan, without drawing any race-based lines. If implemented by the Court, it would easily avoid constitutional challenges, and it would not feed the pernicious perception that Black and White Alabamians must be separated from each other in order to govern themselves.

Dated: September 11, 2023                    Respectfully submitted,

/s/ Henry C. Quillen
Henry C. Quillen
(admitted *pro hac vice*)
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Joe R. Whatley, Jr.
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203

Tel: (205) 488-1200
Fax: (800) 922-4851
Email: jwhatley@whatleykallas.com
           tbrown@whatleykallas.com

*/s/ James Uriah Blacksher*
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel: (205) 612-3752
Fax: (866) 845-4395
Email: jublacksher@gmail.com

Myron Cordell Penn
PENN & SEABORN, LLC
1971 Berry Chase Place
Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT GUTZLER
420 20th Street North, Suite 2525
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
           ehare@dicellolevitt.com

U.W. Clemon
U.W. Clemon, LLC
Renasant Bank Building
2001 Park Place North, Tenth Floor
Birmingham, AL 35203
Tel.: (205) 506-4524
Fax: (205) 538-5500
Email: uwclemon1@gmail.com

Edward Still
2501 Cobblestone Way

Birmingham, AL  35226
Tel: (205) 335-9652
Fax: (205) 320-2882
Email: edwardstill@gmail.com

***Counsel for Singleton Plaintiffs***