FILED

2023 Sep-13  PM 12:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ALABAMA

# SOUTHERN DIVISION

|  |  |
|---|---|
| **IN RE REDISTRICTING 2023**<br><br>**SPECIAL MASTER** | **Misc. No.: 2:23-mc-1181-AMM** |

## BRIEF OF NON-PARTIES ZAC McCRARY AND STEPHEN WOLF

## IN SUPPORT OF PROPOSED REMEDIAL DISTRICTING PLANS[1]

---

[1] Data files for both proposed remedial districting plans may be found at https://bit.ly/3ReRWg9.

## STATEMENT OF INTEREST OF AUTHORS

Zac McCrary is an Alabama resident and partner at Impact Strategies, a public opinion research and consulting firm based in Montgomery. McCrary has been an Alabama resident for more than 25 years and graduated from Alabama public schools and the University of Alabama.

In his professional career, McCrary has worked with candidates and organizations seeking to empower citizens to have a strong voice in government, including working to elect Black candidates to all levels of public office, from the White House and Congress to state legislatures and city halls. McCrary's work in Alabama includes work on behalf of both Democratic and nonpartisan political candidates, independent advocacy organizations and nonprofits, and statewide ballot measures.

Stephen Wolf is a North Carolina resident and an elections writer for the political news and advocacy site Daily Kos. He is a nationally recognized authority on redistricting whose work has been cited by many publications, organizations, and scholars.[2] He has published analyses of dozens of district maps, including for the

---

[2] *See, e.g.,* Miriam Seifter, *State Institutions and Democratic Opportunity*, 72 Duke L.J. 275, 290 n.70, 311 n.180 (2022); *How the Voting Rights Act limits gerrymanders*, The Economist, June 12, 2021, available at https://bit.ly/48f4vhC; *January Redistricting Round-Up: Redistricting Reforms and Litigation*, Brennan Center, Jan. 30, 2017, available at https://bit.ly/44Pg7Vp.

state of Alabama, and has drawn hundreds of hypothetical maps of his own, with a special focus on nonpartisan maps.[3]

Wolf's maps have assisted the decisions of independent redistricting authorities. In March 2019, a bipartisan commission convened by Maryland Gov. Larry Hogan, a Republican, unanimously selected a map created by Wolf to replace the state's 6th Congressional District.[4] That district had been drawn by Democrats in the state legislature in 2011 as a partisan gerrymander designed to elect a Democratic member of Congress. A federal district court later struck down that district for violating the First Amendment. *Benisek v. Lamone,* 348 F. Supp. 3d. 493 (D. Md. 2018), *vacated and remanded* by *Rucho v. Common Cause,* 139 S. Ct. 2484 (2019).

In February 2018, Wolf, together with Dr. Adele Schneider, submitted an amicus brief to the Supreme Court of the Commonwealth of Pennsylvania that proposed a pair of maps as replacements for the state's congressional map.[5] The state's map had been drawn by Republicans in the state legislature in 2011 as a partisan gerrymander designed to elect a disproportionate number of Republicans to

---

[3] *See, e.g.,* Stephen Wolf, *Shock Supreme Court ruling could yield more Black and Latino districts—and flip the House*, Daily Kos, June 8, 2023, available at https://bit.ly/3sBK4uL; Stephen Wolf, *Gerrymandering could cost Democrats the House in 2016. Why? Because it probably did in 2012*, Daily Kos, Oct. 18, 2016, available at http://bit.ly/2nZuUeJ.

[4] Bruce DePuyt, *Hogan Panel Proposes New Congressional Map — Which Dems Are Likely to Ignore,* Maryland Matters, March 1, 2019, available at https://bit.ly/2lXwEXG.

[5] Brief of Amici Curiae Adele Schneider and Stephen Wolf in Support of Proposed Remedial Districting Plans, *League of Women Voters of Pa. v. Commonwealth*, No. 159 MM 2017, available at https://bit.ly/45MbsF7.

Congress. The Pennsylvania Supreme Court later struck down that map for violating the state constitution's Free and Equal Elections Clause. *League of Women Voters of Pa. v. Commonwealth*, 645 Pa. 1, 178 A.3d 737 (2018).

After the legislature failed to pass a new map, the court adopted a remedial map that "dr[e]w[] heavily upon the submissions provided by the parties, intervenors, and *amici*." *League of Women Voters of Pa. v. Commonwealth*, 645 Pa. 576, 583, 181 A.3d 1083, 1087 (2018). Based on a rigorous mathematical analysis, Wolf and Schneider's "Plan B" map more closely resembled the court's remedial map than any other proposal submitted by any party to or participant in the case.[6] The court's remedial map was used in the 2018 and 2020 elections.

Wolf's work on this brief has been undertaken as part of his employment with Daily Kos, an advocacy organization whose mission includes electing Democratic candidates.[7] However, Daily Kos, like the authors of this submission, is also dedicated to supporting fair elections, the Voting Rights Act, and nonpartisan redistricting. The remedial plans put forth in this brief reflect these beliefs and rely solely on nonpartisan criteria. In furtherance of that aim, the authors took no partisan data into account when crafting their plans. However, after completing these plans,

---

[6] Stephen Wolf, *A comparison of Pennsylvania's court-drawn congressional map with proposals by parties and amici*, Daily Kos, Jan. 7, 2020, available at https://bit.ly/486hFx5.
[7] McCrary's work on this brief has not been undertaken as part of his employment with Impact Research.

they calculated their partisan characteristics, which are discussed in greater detail below.

## INTRODUCTION

The authors, at the invitation of Special Master Richard Allen,[8] and acting independently of any party to or participant in this case, propose two districting plans that each remediate the likely violations of Section 2 of the Voting Rights Act found in Alabama's 2023 congressional redistricting plan (the "2023 Plan").

We have endeavored to adhere to the Court's instructions and all relevant law in formulating our remedial plans. Below, we describe our understanding of those instructions and relevant laws.

In its Preliminary Injunction Memorandum Opinion and Order of Jan. 24, 2022, the Court instructed that "the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Milligan* Doc. 107 (the "2022 Order") at 5.[9]

The Court further instructed that, to comply with the 2022 Order, "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 6. The Court reiterated

---

[8] *In Re Redistricting 2023* Doc. 2 ("Amended Order") at 2 (setting "submission schedule" "permitting parties and interested non-parties to participate in the process").

[9] The Court also stated that "the Legislature has discretion to decide whether to enact a remedial plan that contains two majority-Black districts, or two districts in which Black voters otherwise have an opportunity to elect a representative of their choice, or a combination of such districts." *Id.* at 213.

both of these instructions in its Injunction, Opinion, and Order of Sept. 5, 2023. *Milligan* Doc. 272 (the "2023 Order") at 3.

In its Order Instructing the Special Master, the Court provided further requirements with which the Special Master's proposed remedial plans must comport. *Milligan* Doc. 273 (the "Special Master Instructions") at 7-9. Our plans also comport with these requirements.

The Special Master's plans must "[c]ompletely remedy the likely Section 2 violation identified in this Court's order of September 5, 2023," specifically "the unlawful dilution of the Black vote in Alabama's congressional redistricting regime." *Id*. at 7 (reiterating the above-cited instruction from the 2022 Order at 5).

The Special Master's plans must also "[c]omply with the U.S. Constitution and the Voting Rights Act." *Id.* at 7. In crafting our plans, we have complied with the Constitution, including the Equal Protection Clause of the 14th Amendment; Section 2 of the Voting Rights Act, which ensures that minorities have an equal opportunity to elect their candidates of choice; and *Shaw v. Reno*, 509 U.S. 630 (1993), and its progeny, which forbid "intentionally assigning citizens to a district on the basis of race without sufficient justification." *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018).

The Special Master's plans must also "[c]omply with the one-person, one-vote principle guaranteed by the Equal Protection Clause of the Fourteenth Amendment,

based on data from the 2020 Census," such that "there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2 without justification." Special Master Instructions at 7-8. Both of our districting plans feature population deviations no greater than the mathematical minimum of one person.

Finally, the Special Master's plans must also "[r]espect traditional redistricting principles to the extent reasonably practicable," including "compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest." *Id.* at 8-9. In addition, "the courts are forbidden to take into account the purely political considerations that might be appropriate for legislative bodies, such as incumbency protection and political affiliation." *Id.* at 9 (internal citations and quotation marks omitted).

We further explain how we have adhered to each of these traditional redistricting principles below. (The ordering of these principles below does not reflect any particular prioritization of one criterion over another.)

- **Compactness:** We have sought to promote geographic compactness where possible, although "compactness" is a term that has no single legal definition, nor can it. However, persons living closer to one another can often reasonably be inferred to have more in common with one another from the standpoint of communities of interest than those living farther apart, differences in

7

urbanization and other demographic factors notwithstanding. Compactness, however, should not predominate over other nonpartisan criteria, especially in circumstances when persons living in geographic proximity to one another possess starkly different demographic characteristics and interests.

- **Contiguity:** We have sought to maintain district contiguity, with districts having internal transportation connections to the greatest extent feasible, and have avoided the use of water contiguity if possible.

- **Respect for political subdivisions:** We have sought to minimize the number of divided political subdivisions, prioritizing (in order) counties, incorporated municipalities,[10] and voting precincts.[11] If divisions must be made to attain equal population, we have sought to preserve the population cores of cities and urban counties within a given metropolitan area. We have prioritized the division of more populous jurisdictions over smaller ones and more diverse jurisdictions over more homogeneous ones, but only after considering whether the cores of urban areas have been preserved.

- **Maintenance of communities of interest:** We have sought to unite communities of interest defined by: 1) common geography, such as mountain

---

[10] We have treated municipalities as undivided if a split portion of a municipality has zero population. We have also treated municipalities that cross county lines as separate entities within their respective counties.

[11] It was necessary to split a number of precincts in order to keep municipalities whole, avoid bizarrely shaped appendages, and equalize populations between districts.

ranges or rivers, or Census Bureau-defined metropolitan areas; 2) shared culture and history; 3) socioeconomic commonalities, including factors such as income levels, educational attainment, and occupational type. Race can be used—with caution—to define communities of interest as long as it does not violate *Shaw* and its progeny by predominating over other neutral criteria, and as long as its use does not violate the Voting Rights Act.

- **Incumbency:** We have ignored incumbency in developing our plans. The Supreme Court of the United States has held that a legislature may draw district lines to avoid the pairing of incumbents in appropriate circumstances, but in a remedial case such as this one, protecting incumbents elected on the basis of an unlawful map would only further entrench the harmful effects of the legal violations found in that map.[12]

- **Partisanship:** We have ignored data concerning partisanship, including election results and voter registration statistics, in developing our plans. However, after we drew our plans, we calculated the results of recent statewide elections for all districts to assess their effectiveness. Our approach

---

[12] While the Supreme Court has not directly addressed this issue, four justices have stated that whether "the goal of protecting incumbents is legitimate, even where, as here, individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district … is a questionable proposition." *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting).

was similar to the approach taken by the parties to assess various plans that have been put forth throughout this case.[13]

In addition, the Supreme Court has held that a "district court's modifications of a state plan" must be "limited to those necessary to cure any constitutional or statutory defect." *Upham v. Seamon*, 456 U.S. 37, 43 (1982); *see, e.g., League of United Latin Am. Citizens v. Perry*, 457 F. Supp. 2d 716, 718 (E.D. Tex. 2006) ("Our task is narrow: we must do no more than necessary to correct the flaws the Supreme Court found in Plan 1374C — the plan duly enacted by the Texas legislature in 2003 and upheld by this three-judge court in 2004."); *id.* at 721 (noting that "this remedial order makes changes in the lines of five districts, as few as possible consistent with conscientious partisan neutrality").

The Court has specified that the Special Master's proposed remedial plans "shall remediate the essential problem *found in the 2023 Plan*." Special Master Instructions at 7 (emphasis added). We have therefore taken the 2023 Plan as our baseline. We have sought to "do no more than necessary to correct the flaws" of the 2023 Plan by making as few changes as possible to remedy its likely Section 2 violation while we also adhere to the Court's instructions.

---

[13] *See, e.g.,* Defendants' "Alabama Performance Analysis" (*Milligan* Doc. 200-3); *Milligan* and *Caster* plaintiffs' "Supplemental Remedial Report of Baodong Liu, Ph.D." (Doc. 7-2).

Both plans were created using Dave's Redistricting App ("DRA"), a free online redistricting tool first launched in 2009. DRA allows users to draw accurate districting plans and then calculate relevant statistics on a district-by-district basis, such as compactness, election results, and racial demographics. DRA is well-known in the redistricting community, and many of the parties to this case and their counsel are familiar with it and have used it.[14] Courts have also relied on DRA in redistricting litigation. *See, e.g., Brown v. Jacobsen*, 590 F. Supp. 3d 1273, 1291 n.5 (D. Mont. 2022) (relying on DRA for district-level population figures).

## PROPOSED REMEDIAL DISTRICTING PLANS

Below, we present two different remedial districting plans for the Court's consideration. Both plans were drawn to ensure Black voters in the 2nd and 7th Districts can elect their candidates of choice. Both plans also feature the minimum of six county splits[15] and split just five municipalities.

The first plan ("Plan A") makes both the 2nd and 7th Districts majority-Black and prioritizes including almost the entirety of the 18 "core counties" that make up

---

[14] *See, e.g., Milligan* Testimony of Mr. Bryan, Preliminary Injunction Hearing, Doc. No. 105-3 at 302:18–20 (Jan. 7, 2022) (defense expert Thomas Bryan testifying, "I am very familiar" with DRA). *See also* Declaration of William Cooper at 23, *Pendergrass v. Raffensperger*, No. 1:21-CV-05339-SCJ (N.D. Ga. Jan. 12, 2022), Doc. No. 247 (providing link to illustrative map on DRA in Section 2 litigation in Georgia).

[15] Both plans split six individual counties. While it is possible to split fewer total counties, such as by splitting one county between three districts, the total number of county splits cannot be lower than six on any map that adheres to strict population equality.

the Black Belt region in these two districts.[16] (All figures in this brief regarding racial demographics refer to voting-age population data from the Census Bureau.)

The second plan ("Plan B") prioritizes making the 2nd and 7th Districts more compact and limits the 7th District more closely to the Birmingham region to better preserve communities of interest and strengthen the political power of Black voters there. In this plan, the 2nd District is majority-Black while the 7th District would have a voting-age population that is 45.0% Black but would nonetheless allow Black voters to elect their candidates of choice.

---

[16] *See* 2022 Order at 37 (describing the *Milligan* parties' stipulation regarding the definition of the Black Belt).

# PLAN A - MAP AND SUMMARY



Plan A contains two districts where Black voters have an opportunity to elect their candidates of choice, the 2nd District and the 7th District, both of which are majority-Black.[17] The two districts include 17 of the 18 core Black Belt counties and most of the 18th county, covering 90.9% of the region's population. They also include four of the five "additional" counties that are "sometimes included within the definition of the Black Belt" (the "non-core counties"),[18] covering 65.5% of their population. (The fifth non-core county must be included in the adjacent 1st District to maintain contiguity.) Overall, the plan splits six counties and five municipalities.

The 2nd District consists of 10 whole counties and one partial county that make up the 18 core Black Belt counties; four of the five non-core Black Belt counties; and part of Mobile County in the Gulf Coast region. It includes 69.5% of the population of the core Black Belt counties and 65.5% of the non-core Black Belt counties. It also includes 84.9% of the city of Mobile and 75.3% of the city of Montgomery; these two are the only municipalities it splits.

The 7th District consists of the other seven whole core Black Belt counties, covering 21.4% of the region's population, along with all of neighboring Tuscaloosa County and 54.9% of Jefferson County. It splits just two municipalities, both in

---

[17] An interactive version of this plan may be found on DRA at https://bit.ly/3sUEeF5.
[18] See 2022 Order at 37.

Jefferson County, between the 6th and 7th Districts: Birmingham, 80.4% of which is in the 7th District, and Clay, 81.2% of which is in the 6th District.

As the Court is aware, the Black Belt is a region connected by shared history, demographics, and physical geography. The court has taken note of testimony that Black residents of the cities of Birmingham and Mobile also share commonalities with residents of the Black Belt. 2022 Order at 64, 2023 Order at 157-58. In addition, the state has also combined each city with a part of the Black Belt under the Board of Education map it enacted in 2021: Mobile in the 5th District and Birmingham in the 4th District.[19]

Plan A's 2nd District therefore connects most of the Black Belt with Mobile and splits only the counties of Mobile and Montgomery while respecting traditional redistricting criteria, similar to the state's 5th Board of Education District. This configuration allows the 1st District to contain the entirety of the Wiregrass region counties along the Florida border that are not part of the Black Belt. The 2nd District's configuration in Montgomery County excludes some of the city's suburbs with higher income and educational attainment levels and instead combines these areas with demographically similar suburbs in neighboring Elmore County in the

---

[19] *See* 2023 Order at 38-39, noting that *Caster* plaintiffs' expert Bill Cooper "explained that the Board of Education plan splits Mobile County into two districts," "with one district connecting Mobile County to Montgomery County"—the 5th District. The 4th District links the rest of the Black Belt with Birmingham. *See* Alabama State Board of Education Map (adopted in 2021), DRA, available at https://bit.ly/3sR3Um3.

3rd District, which therefore contains 9.1% of the population of the core Black Belt counties.

The 7th District connects almost all of the remaining Black Belt counties with the cities of Tuscaloosa and Birmingham. Our 7th District improves on the 7th District in the 2023 Plan as well as on the 4th Board of Education District by unifying Tuscaloosa County, splitting one fewer county, and dividing five fewer municipalities. It is also more compact. The border between the 6th District and 7th District in Jefferson County closely follows municipal borders and socioeconomic divisions. That enables the 6th District to combine Birmingham's southeastern suburbs, which have higher income and educational attainment levels, with demographically similar suburbs in neighboring Shelby County, all of which is in the 6th District.

To comply with the court's order, the 2nd District is 50.1% Black and 43.6% white, while the 7th is 51.7% Black and 41.9% white.

After developing this map, we calculated the results of recent statewide elections for all districts to assess their effectiveness. Black-preferred candidates won all eight of eight statewide elections in both districts. Black voters would therefore have the opportunity to elect representatives of their choice in both the 2nd District and the 7th District.

Further data describing all districts in Plan A may be found in Exhibits A (racial demographics), B (election results), C (compactness scores), and D (population distribution compared to the 2023 Plan). In addition, Exhibit E includes population statistics for all divided localities in Plan A.

# PLAN B - MAP AND SUMMARY



Plan B contains two districts where Black voters have an opportunity to elect their candidates of choice, the 2nd District and the 7th District.[20] The 2nd District is majority-Black, and the 7th District has a narrow white plurality. Overall, the plan splits six counties and five municipalities.

The 2nd District consists of 12 counties that make up the 18 core Black Belt counties; four of the five non-core Black Belt counties; part of Autauga County in the Montgomery metropolitan area; and part of Mobile County in the Gulf Coast region. It includes 71.5% of the population of the core Black Belt counties; 65.5% of the non-core Black Belt counties; and 89.0% of the city of Mobile, which is the only municipality it splits.

The 7th District consists of all of Tuscaloosa County and 72.7% of Jefferson County. Only three municipalities in Jefferson County are split: The 7th District contains 95.6% of Birmingham, 98.2% of Hoover, and 76.8% of Grayson Valley, while the remainder of each is in the 6th District.

As in Plan A, the 2nd District in Plan B connects most of the city of Mobile with Montgomery and most of the Black Belt region. In contrast with Plan A, it unifies the entirety of Montgomery in the 2nd District, which makes the district more compact. Plan B consequently places 28.5% of the core Black Belt counties'

---

[20] An interactive version of this plan may be found on DRA at https://bit.ly/3LnH7Vo.

population in the majority-white 3rd District, but it nonetheless ensures that the Black Belt is divided between just two districts.

The configuration of the 2nd District in Plan B allows the 7th District to withdraw completely from the Black Belt and instead center on the Birmingham region to further empower Black voters there. As a result, it contains nearly the entirety of Birmingham in Jefferson County, as noted above. As in Plan A, the border between the 6th District and 7th District in Jefferson County closely follows municipal borders and socioeconomic divisions. That allows the 6th District to combine much of Birmingham's southeastern suburbs, which have higher income and educational attainment levels, with demographically similar suburbs in neighboring Shelby County, all of which is in the 6th District.

To comply with the court's order, the 2nd District is 52.3% Black and 41.7% white, while the 7th District is 45.0% Black and 46.8% white.

After developing this map, we calculated the results of recent statewide elections for all districts to assess their effectiveness. Black-preferred candidates won all eight of eight statewide elections in both districts. Although the 7th District has a white plurality, the election results indicate a larger proportion of white voters in the Birmingham region than white voters in the Black Belt are willing to support Black-preferred candidates. Black voters would therefore have the opportunity to elect representatives of their choice in both the 2nd District and the 7th District.

Further data describing all districts in Plan B may be found in Exhibits F (racial demographics), G (election results), H (compactness scores), and I (population distribution compared to the 2023 Plan). In addition, Exhibit J includes population statistics for all divided localities in Plan B.

## CONCLUSION

Both Plan A and Plan B rigorously adhere to the Court's instructions and all relevant law and would completely remediate the likely violations of Section 2 of the Voting Rights Act found in the 2023 Plan. For the foregoing reasons, we respectfully urge the Court to adopt either Plan A or Plan B.

Respectfully submitted,

*/s/ Barry A. Ragsdale*
Barry A. Ragsdale (ASB-2958-A38B)
Robert S. Vance, III (ASB 8816-B11Q)
**DOMINICK FELD HYDE, P.C.**
1130 22nd Street South, Suite 4000
Birmingham, Alabama 35205
Tel.: (205) 536-8888
bragsdale@dfhlaw.com
rvance@dfhlaw.com

*Attorneys for Zac McCrary and Stephen Wolf*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2023, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Barry A. Ragsdale*
Barry A. Ragsdale
