

September 13, 2023

Corrected

Richard F. Allen
Special Master
150 South Perry Street
Montgomery, Alabama 36104

      Re:  *Milligan v. Allen*, Case No. 2:21-cv-01530 (N.D. Ala.)
            *Caster v. Allen*, Case No. 2:21-cv-01536 (N.D. Ala.)

Dear Mr. Allen,

Thank you for this opportunity to comment on behalf of the Brennan Center for Justice at New York University School of Law on the main remedial proposals submitted by parties and non-parties in the above cases.

Founded in 1995 to honor the extraordinary contributions of U.S. Supreme Court Justice William J. Brennan, Jr. to American law and society, the Brennan Center is a not-for-profit, non-partisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Brennan Center conducts regular empirical, qualitative, historical, and legal research on redistricting and has participated in a number of voting rights and redistricting cases around the country in state and federal court, both as counsel and as amicus curiae, including filing amicus briefs at the United States Supreme Court in *Alabama Legis. Black Caucus v. Alabama* (2015), *Cooper v. Harris* (2016), and *Allen v. Milligan* (2023).

The Brennan Center submits these comments (a) to address the concerns raised by the State and parties in related litigation that certain configurations of a map with two performing Black opportunity districts would result in an unconstitutional racial gerrymander and (b) to offer an independent, expert comparison of the main remedial proposals before the special master.

As set forth in this letter, it is the considered view of the Brennan Center that the illegal vote dilution found by the three-judge panel can be addressed only by adopting a robust remedy along the lines proposed by the *Milligan* and *Caster* plaintiffs and that, contrary to assertions by others, applying such a remedy in this case would not violate any constitutional limits on map drawing. By contrast, our assessment is that other proposed

remedies, even some that have arguable merit, either would fail to provide a meaningful opportunity to elect Black-preferred candidates in two districts, as ordered by the district court, or would be less likely to perform consistently over time.

Given that Alabama politics is likely to continue to be characterized by highly racially polarized voting patterns – especially in rural regions and particularly so when a Black candidate is Black voters' preferred candidate – we strongly believe that selecting or creating a map with two *majority* Black districts would provide the best assurance of a complete remedy for the vote dilution injury and, at the same time, would afford a greater share of Black voters in Alabama with a meaningful chance to elect preferred candidates.

We would be happy to respond to any questions you may have.

**Opening Observations on Racial Gerrymandering**

Both the State and the plaintiffs in *Singleton v. Allen*, Case No. 2:21-cv-01291 (N.D. Ala.), contend that dividing certain counties in a plan would result in an unconstitutional racial gerrymander, although they disagree somewhat on which counties cannot be divided. The State's concerns focus on the division of Mobile County, while the *Singleton* plaintiffs focus their racial gerrymandering arguments primarily on the longstanding division of Jefferson County, home to the City of Birmingham.

However, the arguments of both the State and the *Singleton* plaintiffs assign to Alabama counties a special protected status in congressional redistricting that they have never enjoyed under Alabama law.  Provisions of the Alabama Constitution only refer to keeping counties whole for state legislative line drawing, not for congressional districts. Ala. Const., art. IX, § 199-200.  And in almost every level of map drawing, the state's practice has not treated counties as indivisible units.  Under Alabama's longstanding practice, many counties (including larger ones like Jefferson County and Mobile County) are regularly split in maps.

For example, the State's 2021 and 2023 enacted congressional plans, like the *Milligan* and *Caster* plaintiffs' joint proposed plan, the Singleton plan, and the Pringle plan, all divide Tuscaloosa County. Likewise, until 2023, the City of Montgomery along with the rest of Montgomery County, was divided (between 2010 and 2020, even divided twice) in all of the state's congressional redistricting plans since 1992. And the state's 2021 and 2023 plans, like the *Milligan* and *Caster* plaintiffs' proposed map, all divide Jefferson County, placing the much of Birmingham in a different district than its southern suburbs.

For its part, Mobile County is currently divided among districts more than required for compliance with equal population requirements in multiple state maps drawn after the 2020 Census.  These include the State House, State Senate and, most notably, the Alabama's State Board of Education. The SBOE map divides the county much in the way that the *Milligan* and *Caster* plaintiffs recommended in their map.  Neither the State nor the *Singleton* plaintiffs have criticized this laundry list of county divisions that have existed for decades for good reason.  Aside from the fact they themselves are responsible

for endorsing most of them, none of the aforementioned divisions per se qualify as racial gerrymanders under existing law.

Although racial gerrymandering jurisprudence places some limits on what map drawers can do when remedying vote dilution, the Supreme Court has never endorsed nor imposed limits anywhere near as expansive or radical as those that the State and *Singleton* plaintiffs ask to be applied in this case.

To start, racial gerrymandering case law does not forbid all consideration of race or attention to racial effects in districting. Far from it. Disparities between and within geographic communities often fall heavily along racial lines, especially in the South where officially sanctioned racial segregation shaped public and private decisions alike for decades. Acknowledging those heavily racialized disparities and taking them into account is perfectly legitimate when deciding which overlapping communities of interest are most important to prioritize in a district map and which can, when necessary, yield to accommodate competing demands.

Nor is the mere fact that a map drawer's selection of communities to locate in a given district shifts the demographic composition of that district enough, by itself, to establish a racial gerrymander. In much of the South, the pattern of longstanding of residential segregation means that communities that may have clearly recognizable, non-race based representational needs and interests are also often disproportionately populated by members of one racial group or another. A map drawer is not prohibited from putting a city that is marked by significant social and economic disadvantages in the same district as other similarly situated communities merely because doing so would make the district population more Black. *Miller*, 515 U.S. at 916 ("legislatures will . . . almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process").

The Supreme Court's racial gerrymandering jurisprudence is clear on the relevant inquiry. In assessing a map, the question is not whether a district divides a county, or even whether the division affected the racial composition of districts. Instead, the inquiry focuses on whether decisions about how and where to divide a county (or another geographic unit) can be rationally explained only as an effort to sort voters by race *and nothing more*. For example, in rejecting Alabama's 2010 era state legislative maps, which divided vote tabulation districts (VTD's) in stubborn pursuit of specific percentages of Black voters, the Supreme Court observed that pursuing "mechanical racial targets" in this manner was unjustifiable. See *Alabama Legis. Black Caucus v. Alabama,* 575 U.S. 254, 266-268. Under the Supreme Court's racial gerrymandering jurisprudence, what is prohibited is not the mere act of joining minority communities together, but rather the haphazard grouping of people who have nothing in common other than their race based on crude, stereotyped assumptions that "members of the same racial group – regardless of their age, education, economic status, or the community in which they live – think alike, share the same political interests, and will prefer the same candidates at the polls." *Shaw v. Reno*, 509 U.S. 629, 647-648 (1993). The State's and *Singleton* plaintiffs' constrictive, alternative interpretation of racially gerrymandering law has never been endorsed by any court.

Viewed with a proper understanding of the law, the attacks levied by both the State and the *Singleton* plaintiffs on the *Milligan* and *Caster* plaintiffs' plan are perplexing. To start, none of the limited number of county splits in the VRA plaintiffs' proposed plan mirror the sort of ruthless surgical, block-by-block separation of white and Black voters that have led courts to conclude that race predominated in the drawing of a district. In *Bush v. Vera*, for example, the court faced a Texas congressional map (shown below) where line drawers hopscotched across three counties in the Dallas-Fort Worth Metroplex to put any sizeable pocket of Black voters in a new Black majority district, bypassing white and Latino precincts along the way and creating a non-compact, bizarrely shaped district that the Supreme Court found "unexplainable in terms other than race." *Bush*, 517 U.S. at 972; *Cooper*, 581 U.S. at 295 (discussing "finger-like" appendages closely tracking racial lines used to create packed Black districts in North Carolina's congressional map).



Similarly, in a recent racial gerrymandering case challenging South Carolina's congressional map, the court found that Republican map drawers committed a racial gerrymander when they made changes to the state's First Congressional District at the voting tabulation district (VTD) level, moving VTDs within the city of Charleston in and out of the district depending on how many Black voters they had. *South Carolina State Conf. of NAACP v. Alexander*, -- F.Supp.3d --, 2023 WL 118775 *6-8 (D.S.C. January 6, 2023).

By contrast, in the VRA plaintiffs' proposed map, when county splits occur, tracks closely to the boundaries of functional and easily identifiable non-racial communities of interest. For example, in dividing Jefferson County, the VRA plaintiffs' proposed map, like the state's 2021 and 2023 redistricting plans, places all but small parts of the city of Birmingham, which is nearly a quarter white and more than 30 percent non-Black, in CD-07. While including Birmingham in CD-07 adds a significant number of Black voters to the district, it also adds sizable numbers of white and other non-Black voters.

Likewise, the maps all leave significant areas with Black voters in the non-Birmingham parts of Jefferson County in CD-06, along with their white neighbors.

Far from cherry picking Black precincts for inclusion in a district, as the map drawers in *Bush*, *Cooper,* and *Alexander* did, the VRA plaintiffs' plan recognizes that the city of Birmingham is a significant community of interest with common concerns and representational needs that cut across racial lines and, accordingly, keeps it substantially whole. The division of Mobile County in the VRA plaintiffs' map similarly corresponds closely to choices the state itself has made in other redistricting plans, most notably its plan for the State Board of Education, which places the part of the city of Mobile, but not the rest of Mobile County, in a district joined to Montgomery and portions of the state's Black Belt. *Singleton v. Merrill*, 582 F.Supp.3d 924, 978 & fn. 8 (2022) (three-judge panel). To be sure, in each instance, there might well be policy arguments for not splitting Mobile or Jefferson counties in this way. But those are the state's policy goals, not constitutional concerns. The Constitution does not require giving priority to a state's policy preferences nor can a state's policy desires or goals outweigh the federal mandate of the Voting Rights Act with respect to remedying vote dilution.[1]

**Comparison of Proposed Plans**

To assist the special master in preparing three proposed maps for consideration by the district court, the Brennan Center analyzed the electoral performance of districts in the principal remedial plans submitted to the special master and calculated the percentage of Black Alabamians who would be included in an opportunity district under each plan. We view these considerations as important factors that ought to weigh heavily in evaluating the merit of a given plan.

Our quantitative analysis of the mapping proposals shows that the VRA plaintiffs' proposed map stands out because it sets out a full and effective remedy. Specifically, measures of how well preferred candidates perform in competing plans and the extent to which each plan covers the class of plaintiffs in this case reveal only one leading plan in this case.

    A.   <u>Performance Analysis</u>

The most common way to assess compliance with Section 2 is to measure the extent to which a district map will produce an opportunity to elect for candidates preferred by the plaintiff class. This is commonly derived using a performance analysis, taking returns from multiple prior statewide election returns to gauge the likelihood that minority-preferred candidates in a given district would succeed if an election were held using proposed district boundaries. *See League of United Latin American Citizens v. Perry*, 548 U.S. 399, 428 (2006) (using statewide elections to assess whether a district was an effective Latino opportunity district).

---

[1] To the extent the VRA plaintiffs' map makes some choices based on race, those choices are narrowly tailored to address the vote dilution found by the district court and to ensure that Black voters in a state with some of the most extreme rates of racially polarized voting in the country have reasonable opportunities to elect their preferred candidates.

To examine differences in proposals for redrawing Alabama's congressional map, the Brennan Center conducted a performance analysis using precinct-level results for statewide elections in Alabama between 2016 and 2020 (a total of fifteen elections), comparing (1) the 2023 legislatively enacted plan, (2) the Pringle plan[2], (3) the VRA plaintiffs' joint plan,[3] and (4) the Singleton plan.[4]

Utilizing election data as far back as 2016, we were able to include multiple contests for federal and state offices and assess how variations in turnout behavior during presidential and midterm election cycles could shift a district's performance. This election set includes both elections where the Black-preferred candidate was white and, more probative ones, where the Black-preferred candidate was Black.

*Figure 1*

**Black-Preferred Candidates' Election Performance by Congressional Plan**

| PLAN | BLACK OPPORTUNITY DISTRICT(S) | NUMBER OF RECENT ELECTIONS WHERE THE BLACK-PREFERRED CANDIDATE WINS | AVERAGE PERCENTAGE OF VOTES RECEIVED BY BLACK-PREFERRED CANDIDATES |
|---|---|---|---|
| **2021** (Struck Down) | AL-07 | 15/15 | 67.9% |
| **2023** (Struck Down) | AL-07 | 15/15 | 63.6% |
| **VRA Plaintiffs** (Proposed) | AL-02<br>AL-07 | 15/15<br>15/15 | 57.7%<br>67.5% |
| **Singleton** (Proposed) | AL-06<br>AL-07 | 15/15<br>15/15 | 57.4%<br>56.2% |
| **Pringle** (Proposed) | AL-02 (Alleged)<br>AL-07 | 4/15<br>15/15 | 49.5%<br>64.4% |

**Source:** Brennan Center analysis of proposed congressional plans

### *The Legislature's 2023 Plan*

Unsurprisingly, the State's invalidated 2023 plan was a decided failure in terms of the directive to provide Black voters with the ability to elect their preferred candidates in two districts.

---

[2] Case No. 2:23-mc-01181, Doc. #6.

[3] Case No. 2:23-mc-01181, Doc. #7.

[4] Case No. 2:23-mc—01181, Doc. #3.

Under the 2023 plan, CD-02 was redrawn with a Black voting age population of just over 40 percent, which the State contended was adequate to meet its obligation to remedy the vote dilution found by the district court.

But as Figure 1 shows, CD-02 would have elected just one Black-preferred candidate in the recent fifteen elections we examined.  The lone exception was the 2017 special election for U.S. Senate, which was atypical due to its off-schedule date, a high-profile and controversial campaign, lower overall turnout, but higher-than-average participation among Black voters.  In the each of the remaining fourteen contests, the Black-preferred candidates would only receive between 44 and 48 percent of the district's vote.

### *The Pringle Plan*

The Pringle plan does only marginally better. Like the state's 2023 plan, the Pringle plan purports to respond to the district court's order by redrawing CD-02, in this case to be a district that is 42.5 percent Black.[5]

However, Black-preferred candidates in the Pringle plan's version of CD-02 would prevail in only four of the fifteen recent elections that we examined: the 2017 special election for U.S. Senate, the 2020 election for U.S. Senate, the 2018 election for Chief Justice of the Alabama Supreme Court, and the 2018 election for Attorney General. Except for the 2017 Senate special election (which is exceptional for reasons described above), Black-preferred candidates prevailed in the other contests by less than two percentage points. Notably, none of the three races where Black-preferred candidates would prevail in this proposed district featured a Black candidate as the preferred candidate, which is relevant in evaluating the ability of voters to elect candidates when the preferred candidate who emerges from the primary is Black.

### *The Milligan and Caster Plaintiffs' Plan and the Singleton Plan*

By contrast, the *Milligan* and *Caster* plaintiffs' joint plan and the Singleton plan both would allow Black-preferred candidates to prevail in two districts in all fifteen of the recent elections we analyzed. However, we found some key performance differences which, on balance, suggest that the *Milligan* and *Caster* plaintiffs' plan would be a more effective and sure-footed remedy if applied in practice.

The Singleton plan would address the vote dilution found by the district court by creating two *non-majority* Black districts: CD-06 redrawn to include the whole of Jefferson County, including Birmingham, and CD-07, which it would transform into a more solidly rural district covering much of the Black Belt. Under the Singleton plan, heavily urban CD-06 would have a BVAP of 39.6 percent, while the more rural CD-07 would have a BVAP of 49.4 percent.[6]

---

[5] Doc. #6, Exhibit 2.

[6] Doc. #3 at 7.

On average, Black-preferred candidates would win an average of vote share of 56 percent in CD-07 and 57 percent in CD-06 under the Singleton plan. But, worryingly, the average performance in CD-07, the Singleton plan's much more rural configuration of a Black Belt district, is slightly lower than the average performance in its CD-06, anchored by the urban center of Birmingham. Given that the Black Belt has some of the highest levels of racially polarized voting in Alabama and relatively lower levels of Black voter turnout, this lagging measure of performance in CD-07 suggests the possibility that the district might not, in fact, perform as an opportunity district in a hyper-polarized climate where white voters are exceptionally motivated and mobilized. This concern is all the more pressing insofar as CD-07 is drawn with no current Black-preferred incumbent running for the seat.

Unlike the Singleton plan, the proposal from the *Milligan and Caster* plaintiffs would remedy the vote dilution much more completely by creating two Black *majority* districts (CD-02 and CD-07).[7] As with the Singleton plan, our analysis of this plan shows that the preferred candidates of Black voters would consistently win all fifteen contests in both these districts. However, the average vote share won by Black-preferred candidates under the *Milligan* and *Caster* plaintiffs' plan is consistently higher than the Singleton plan, with Black-preferred candidates winning on average nearly 58 percent of the vote in the plan's version of CD-02 and nearly 68 percent in its CD-07. The higher average performance levels for this plan are important because they provide greater assurance that the opportunity to elect in both these districts will be consistent and effective across multiple of elections and all reasonably foreseeable variations in voter turnout.

### B. Percentage of Black Alabamians Included in the Remedy

In addition to assessing how consistently a district will yield a successful preferred candidate, it is also important to consider in a quantitative way how well each of the maps extend a meaningful remedy to the plaintiff class in question, *i.e.*, how many Black voters in Alabama would directly benefit from the adopted remedy. We assert that the share of the Black voters who can exercise an equal opportunity to elect in a district is a key point of comparison for how "complete" a given remedy might be and that it should significantly inform the special master's review of the proposals.

As a baseline for this analysis, we began with the invalidated 2021 map that included only one opportunity district (CD-07, a district with a BVAP under 56 percent). In the decidedly racially polarized landscape in Alabama, six of the state's seven congressional districts each had a Black voting age population far too low for Black voters' preferred candidates to have any reasonable chance of electoral success. More than two of every three Black voters in Alabama were located in a congressional district with no cognizable opportunity to elect preferred candidates, a high rate of exclusion for a state with a Black population of almost 30 percent.[8]

---

[7] Doc. #7, Exhibit 3 at 3.

[8] Of course, some of the excluded population is either geographically dispersed (e.g., rural counties northeast of the Black Belt) or in distant urban areas (*e.g.,* Madison County). Nonetheless, almost 70 percent of Alabama's Black voters are excluded from political opportunity in the illegal map.

We also examined Alabama's recently invalidated 2023 plan, a supposed remedial map that shockingly manages to exclude even more Black voters from directly enjoying political opportunity. Under the 2023 map, the reconfigured CD-07 remains the lone majority Black district (with a notably lower BVAP of 50.7 percent), joined by a second 40 percent BVAP district that pairs eastern Black Belt counties including Montgomery County with counties of the Wiregrass region. Due to the smaller Black population in the adjusted version of CD-07 and the state's refusal to create meaningful political opportunity in the new CD-02, the share of excluded Black voters statewide in this plan actually increases to nearly 71.5 percent.

The Pringle plan, likewise, also would leave the vast majority of Black Alabamians in districts where they have no realistic opportunity to elect preferred candidates. Only 29 percent of Alabama's Black voters would live in an opportunity district under the Pringle plan.

The Singleton plan, by contrast, would do slightly better on this metric, but even still, more than half of Alabama's Black voters, including some of the *Milligan* and *Caster* plaintiffs, would continue to live outside of an opportunity district.

Of all the maps we reviewed, only the *Milligan* and *Caster* Plaintiffs map extends a meaningful remedy to a majority of Alabama's Black voters, with approximately 58 percent of the state's Black voters living either in the Black majority CD-02 or in Black majority CD-07. That the performance analysis also reveals that these districts provide a more reliable and effective opportunity to Black voters to elect preferred candidates.

*Figure 2*

**Black Voting Age Population (BVAP) in Alabama Congressional Plans**

| PLAN | BLACK OPPORTUNITY DISTRICT(S) | DISTRICT BVAP | SHARE OF STATEWIDE BVAP INSIDE OPPORTUNITY VOTING DISTRICTS |
|---|---|---|---|
| 2021 (Struck Down) | AL-07 | 54.2% | 30.4% |
| 2023 (Struck Down) | AL-07 | 54.2% | 28.5% |
| VRA Plaintiffs (Proposed) | AL-02<br>AL-07 | 49.7%<br>54.2% | 58% |
| Singleton (Proposed) | AL-06<br>AL-07 | 39.6%<br>49.4% | 49.1% |
| Pringle (Proposed) | AL-07 | 50.8% | 29% |

**Source**: Brennan Center analysis of proposed congressional plans.

## Conclusion

It is vital that the remedial map adopted by the district court offer Black Alabamians a full, sustainable, and meaningful remedy for the vote dilution created by the State's 2021

congressional districting plan. After enduring a complete election cycle without a legal map, voters in the state are entitled to a map that addresses the identified harms in a complete, not piecemeal manner.  Based on the Brennan Center's assessment, of the main maps submitted to the special master, only the *Milligan* and *Caster* plaintiffs would provide this type of robust remedy and, at the same time, apply a remedy that directly affects a majority of the state's Black voters. While some proposals are not without their merits, they also exclude most Black Alabamians from directly enjoying equal opportunity and carry greater risk of non-performance at some point this decade. Accordingly, the Brennan Center urges the special master to base his three map proposals for the district court on the proposal offered by the *Milligan* and *Caster* plaintiffs.

    Respectfully,

    Kareem U. Crayton
    Michael C. Li