FILED

2023 Sep-13  PM 11:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE REDISTRICTING 2023** **SPECIAL MASTER** | **Misc. No. 2:23-mc-1181-AMM** |

## SECRETARY ALLEN'S COMMENTS TO
## PROPOSED REMEDIAL PLANS

In accordance with the Special Master's order, Defendant Secretary of State Wes Allen submits these comments to the proposed remedial maps submitted to the Special Master. *See* Doc. 2 at 2.

Any court-drawn remedial plan must keep in place the existing 2023 Plan, except to the extent necessary to comply with the District Court's injunction. The District Court's "remedial authority" is still "limited" in these circumstances. *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018). "[S]tate legislatures have primary jurisdiction over legislative reapportionment," *White* v. *Weiser*, 412 U. S. 783, 795 (1973) (internal quotation marks omitted), and a legislature's "freedom of choice to devise substitutes for an apportionment plan found unconstitutional"—or here, a likely §2 violation—"either as a whole or in part, should not be restricted beyond the clear commands" of federal law, *Burns* v. *Richardson*, 384 U. S. 73, 85 (1966). A district court is "not free … to disregard the political program of" a state

legislature on other bases. *Upham v. Seamon*, 456 U.S. 37, 43 (1982) (per curiam). A district court cannot "override the legislature's remedial map" in a way that goes beyond what is necessary to meet the demands of federal law. *Covington*, 138 S. Ct. at 2554. Once the violation has been remedied, the District Court's "proper role in" Alabama's "districting process [i]s at an end." *Id.* at 2555.

The Singleton Plan, for example, violates this principle by significantly altering numerous districts when compared to the 2023 Plan, even in parts of the State where the *Caster* and *Milligan* Plaintiffs never pressed any § 2 claim. *See Milligan* Doc. 1 at 49 (challenging Districts 1, 2, 3, and 7); *Caster* Doc. 3 at 11-14 (allegations about black population in Districts 1, 2, 3, and 7). The same is true for several of the nonparty plans. *See, e.g.*, Doc. 4-1 at 31 (Hillyer Plan redrawing districts in the north of the State); *see also* Doc. 11 at 18 (McCrary Plan B redrawing Districts 3, 4, 6, 7).

The VRA Plaintiffs' Remedial Map has similar flaws, while also significantly splitting communities of the Gulf Coast and Wiregrass, *see Milligan* Doc. 220-12 at 11-12, and splitting more counties than needed to satisfy the equal population requirement without explaining why such significant departures from the 2023 Plan are "necessary to meet the specific … violations involved." *Upham*, 456 U.S. at 42. Like the VRA Plaintiffs' plan, the Alabama Democratic Conference's proposal splits more counties than necessary to satisfy the equal population requirement and sacrifices compactness to create districts above 50% BVAP. *See* Doc. 10 at 7 ("The plan

splits 11 counties…."); *see also* Doc. 11 at 14 (McCrary and Wolf Plan A splitting Black Belt County of Montgomery and Montgomery City, which the Milligan Plaintiffs' argued was a "significant majority-Black communit[y] of interest," Milligan Appellees' Br. at 20-21).

Indeed, while the Singleton and VRA Plaintiffs, as well as various non-parties, assert that their plans are sufficient to remedy the likely § 2 violation identified by the District Court, none show that the significant alterations they propose to the 2023 Plan are "necessary" to remedy the likely violation. And it is error for "a court-ordered plan [to] reject[] state policy choices more than [i]s necessary to meet the specific … violations involved." *Upham*, 456 U.S. at 42. For example, the VRA Plaintiffs note that in the seventeen statewide elections the *Caster* expert analyzed for their proposed Districts 2 and 7, Democrats would win 32 out of 34 elections. *See* Doc. 7 at 5. And even in the two elections in which a Republican garnered a majority of the vote, the Democrat received 49.6% and 48.4% in the respective contests. *See* Doc. 7-1 at 3; *see also, e.g.*, Doc. 11 at 17, 20 (McCray calculating that "Black-preferred candidates won all eight of eight statewide elections in both districts" in both McCrary Plans A and B).

Before the Supreme Court, the *Milligan* Plaintiffs eschewed the notion that remedial districts must exceed 50% BVAP to satisfy § 2. *See Milligan* Respondents' Br. at 44-45. But here, they and several non-parties have proposed such districts. In

the VRA Plaintiffs' Plan, that leads to moves like districting together voters from Houston County all the way to Mobile, to guarantee political victory. They fail to explain why such dramatic changes to the 2023 Plan are required to ensure that all Alabamians have an equal opportunity, distinct from guaranteed victories, to participate in the political process and to elect the candidates of their choice. *See Perez v. Abbott*, 253 F. Supp. 3d 864, 882 (W.D. Tex. 2017) (rejecting "Plaintiffs' position that a district provides opportunity only if the district would allow minority voters to elect their candidate of choice more than 50% of the time in an exogenous election index"). The same is true for the Singleton Plaintiffs, who state expressly that "[t]he preferred candidates of Black voters have had *more than equal* success in the two opportunity districts in the Singleton Plan." Doc. 5 at 9 (emphasis added); *but see Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (plurality) ("Section 2 does not guarantee minority voters an electoral advantage.").

The Campaign Legal Center submitted a letter suggesting that statewide elections in Alabama 2022 are more probative of how a proposed district is likely to perform than data from earlier redistricting cycles because the Democrats who ran in those elections were black. *See* Doc. 13 at 4. But as Senator Bobby Singleton has noted at the August 15, 2023 preliminary injunction hearing and his submission to the special master, some of those candidates (e.g., the 2022 Democratic candidate for Governor, Yolanda Flowers) significantly lagged their Republican opponents in

experience, funding, name recognition, and organization. *See Singleton* Tr. 44:10-45:7; *see also* Doc. 5 at 11 (noting that Flowers "was outspent 850 to 1" by Governor Kay Ivey in the 2022 election). The Court should not simply assume that Democratic candidates in 2022 performed worse than Democratic candidates in 2018 because of race.

The CLC asserts without citation that the VRA Plaintiffs' "proposed districts are both visually and mathematically compact—more so than other districts included in the State's rejected enacted plan and remedial plan." Doc. 13 at 6. That is not true. On average, the 2023 Plan is more compact than the VRA Plaintiffs' Plan under both Reock and Polsby-Popper metrics. *See Milligan* Doc. 220-12 at 9-10. And when it comes to individual districts, on those metrics, the least compact district in the 2023 Plan performs better than three of the seven districts in the VRA Plaintiffs' Plan. *Id.*

Finally, without relitigating the District Court's liability finding, the Secretary maintains his argument that a remedial plan that requires race to predominate over traditional districting principles is unconstitutional, whether that plan sacrifices neutral principles to create majority-black districts or "crossover" districts. Contrary to some of the arguments in the submissions to the special master, a district can be a racial gerrymander even if its shape is not "so bizarre that it is unexplainable other than on the basis of race." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 188 (2017); *contra* Doc. 5 at 6 (asserting Singleton Plan does not use "race-

based lines"); Doc. 13 at 6 (arguing that "[d]istricts that have over three-quarters of their territory comprised of whole counties, like those proposed by the VRA Plaintiffs, cannot plausibly be labeled racial gerrymanders"); Doc. 20-1 at 4 (arguing that the VRA Plaintiffs' plan is not "bizarrely shaped"). At the very least, the use of race in any remedial plan certainly must be "narrowly tailored to comply with § 2." *Bush v. Vera*, 517 U.S. 952, 982 (1996) (plurality).

Respectfully Submitted,

Steve Marshall
 *Attorney General*

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
 *Solicitor General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
 *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

6

Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

**Counsel for Secretary Allen**

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2023, I filed the foregoing using the Court's CM/ECF system, which will serve all counsel of record.

/s/ Edmund G. LaCour Jr.
*Counsel for Secretary Allen*