FILED

2023 Sep-13  PM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **In re Redistricting 2023** | **Misc. No.: 2:23-mc-1181-AMM**<br>**Three-Judge Court** |

### *SINGLETON* PLAINTIFFS' COMMENTS ON
### PROPOSED REMEDIAL PLANS

The *Singleton* Plaintiffs respectfully submit the following comments on the
plans proposed by the *Milligan* and *Caster* Plaintiffs, Representative Pringle, and
nonparties. The *Singleton* Plaintiffs also respond to the briefs filed by the Brennan
Center for Justice and the Campaign Legal Center.

## I.      The VRA Plan

### A.      The VRA Plan Does Not Comply with the Equal Protection Clause Because It Uses Racial Targets to Segregate Voters by Race Without Sufficient Justification.

The *Singleton* Plaintiffs strongly support the *Milligan* and *Caster* Plaintiffs'
painstaking demonstration that Alabama violated the Voting Rights Act not once,
but twice. The *Singleton* Plaintiffs also share their desire to provide equal
opportunity for Black Alabamians to participate in the political process. The
*Singleton* Plaintiffs are concerned, however, that the *Milligan* and *Caster* Plaintiffs
have chosen a remedial plan that endangers the goal all three sets of plaintiffs have
worked so hard to achieve. It appears that the *Milligan* and *Caster* Plaintiffs believe
that because the District Court held that race did not predominate in the creation of

the illustrative plans they used to establish liability under the Voting Rights Act, the Equal Protection Clause permits the Court to implement those plans (or similar ones) as remedial plans without analyzing whether those plans' use of non-negotiable racial targets was necessary to avoid a violation of the Voting Rights Act. This theory contradicts thirty years of Supreme Court precedent, which has culminated in four recent decisions invalidating plans designed to ensure majority-minority districts. Adopting a race-based plan like the VRA Plan over a race-neutral plan like the Singleton Plan would give the Defendants an opportunity to win reversal at the Supreme Court and once again challenge the constitutionality of the *Gingles* standard.

To be clear, the *Singleton* Plaintiffs are not claiming that the *Milligan* and *Caster* Plaintiffs, or the District Court or Supreme Court, did anything wrong when determining that the 2021 and 2023 Plans likely violate Section 2 of the Voting Rights Act. To establish liability under Section 2, the *Milligan* and *Caster* Plaintiffs did exactly what they were supposed to do: they submitted illustrative plans showing that Black Alabamians are numerous and geographically compact enough to constitute a majority in two reasonably configured districts, as the first *Gingles* precondition requires. *Singleton v. Allen*, No. 2:21-cv-1291-AMM (N.D. Ala.), ECF No. 88 at 52; *see Cooper v. Harris*, 581 U.S. 285, 301 (2017) (citing *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986)). They did so through their experts Dr. Moon

Duchin and Mr. Bill Cooper, who each created multiple illustrative plans designed to have two majority-Black districts but otherwise respect Alabama's traditional districting principles. *Singleton*, ECF No. 88 at 52–64, 84–90; Preliminary Injunction Hearing Tr. 577:16–20 (Dr. Duchin testifying that drawing "two majority-black districts" was "non-negotiable"); *Caster v. Allen*, No. 21-cv-1536-AMM (N.D. Ala.), ECF No. 84 at 15 ("Mr. Cooper was expressly engaged to draw black majority districts.") (internal quotation marks omitted).

The Defendants challenged this use of race—treating the creation of two majority-Black districts as "non-negotiable"—as unconstitutional, even for illustrative districts used to establish the first *Gingles* precondition. *Singleton*, ECF No. 88 at 204. The District Court rejected this challenge on two grounds. First, race did not predominate in the creation of the illustrative plans:

> [Dr. Duchin and Mr. Cooper] explained that they prioritized race only as necessary to answer the essential question asked of them as *Gingles* I experts: Is it possible to draw two reasonably compact majority-Black congressional districts? More particularly, Dr. Duchin and Mr. Cooper testified that they prioritized race only for the purpose of determining and to the extent necessary to determine whether it was possible for the *Milligan* plaintiffs and the *Caster* plaintiffs to state a Section Two claim.

*Id.* at 204–05 (citation omitted).[1] Second, even if race did predominate, its use was narrowly tailored to protect a compelling state interest: compliance with the

---

[1] It should give everyone pause that a majority of the Supreme Court did *not* affirm the District Court's opinion that race did not predominate in the creation of Dr. Duchin and Mr.

requirements for proving a violation of the Voting Rights Act. Based on Dr. Duchin and Mr. Cooper's testimony, the District Court did "not see 'a level of racial manipulation that exceeds what § 2 could justify.'" *Id*. at 206 (quoting *Bush v. Vera*, 517 U.S. 952, 980–81 (1996)).

In the context of proving the first *Gingles* precondition, this analysis was correct. As the District Court noted, prioritizing race to ensure that districts in illustrative plans contain at least a Black majority is inherent to the *Gingles* analysis. *Singleton*, ECF No. 88 at 205–06. And even if that limited use of race implicates the Equal Protection Clause, it is necessary to prove a violation of the Voting Rights Act, and therefore is narrowly tailored to protect the compelling state interest in enforcing the Voting Rights Act. *Id.* at 206.

In the context of creating a plan that determines how actual voters will cast their ballots in actual elections—which was not at issue in the District Court or the Supreme Court—the analysis is completely different. Thirty years ago, the Supreme Court held that "an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification" gives rise to a claim under the Equal Protection Clause. *Shaw v. Reno*, 509 U.S. 630, 652 (1993). "When a State invokes

---

Cooper's illustrative plans, even on clear error review. *See Allen v. Milligan*, 143 S. Ct. 1487, 1510–12 (2023) (plurality opinion). The Supreme Court's unwillingness to agree that race did not predominate cautions against extending the District Court's holding beyond the context of *Gingles* I.

the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." *Cooper v. Harris*, 581 U.S. 285, 292–93 (2017) (quoting *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). But the Voting Rights Act requires the creation of a majority-minority district *only* if there is "good reason to think that all the '*Gingles* preconditions' are met." *Id.* at 302 (citing *Bush v. Vera*, 517 U.S. at 978). The third *Gingles* precondition—that "a district's white majority must vote sufficiently as a bloc to usually defeat the minority's preferred candidate"—is not met "in areas with substantial crossover voting." *Id.* at 304–06 (cleaned up). Simply assuming that the Voting Rights Act requires the creation of a majority-minority district without a "strong basis in evidence" is "a pure error of law." *Id.* at 306. Remedying this pure error of law is the basis of both the constitutional claims the *Singleton* Plaintiffs have been making since they filed their complaint in September 2021, and their claim in these VRA remedial proceedings that any majority-Black districts drawn to remedy the Section 2 violation must survive strict scrutiny. This is why the District Court could assure the *Singleton* Plaintiffs that "a decision on the constitutional issue would not entitle [them] to relief beyond that to which they are entitled on their statutory claims." *Singleton*, ECF No. 191 at 194 (cleaned up).

The District Court has acknowledged the fundamental distinction between the standards for illustrative plans and the standards for remedial plans: "[I]f we determine that the Plan violates Section Two, that would not be a determination that the *Milligan* plaintiffs are entitled to a map of their choice, or to one of the remedial maps submitted to establish the first *Gingles* requirement: those maps are illustrative maps submitted for the purposes of establishing liability under Section Two." *Singleton*, ECF No. 88 at 51. Nothing the District Court has said about illustrative plans should be construed to apply to court-ordered remedial plans, which were not at issue when the Court issued its injunctions in 2022 and 2023.[2]

In recent years, the Supreme Court has struck down majority-minority districts four times because there was insufficient evidence that they were necessary to comply with the Voting Rights Act. In *Cooper v. Harris*, North Carolina's mapmakers "purposefully established a racial target: African–Americans should make up no less than a majority of the voting-age population" in Congressional District 1. 581 U.S. at 299. The legislative sponsors of the resulting plan "repeatedly told their colleagues that District 1 had to be majority-minority, so as to comply with

---

[2] In its order denying the Secretary's motion for a stay, the District Court stated, "As we have found and the Supreme Court has affirmed, there are at least eleven maps illustrating how the required remedy lawfully can be provided." *Singleton*, ECF No. 200 at 23. The *Singleton* Plaintiffs understand the District Court to mean that each of the *Milligan* and *Caster* Plaintiffs' illustrative plans complies with the Voting Rights Act, with which the *Singleton* Plaintiffs agree. If the District Court meant that these plans were not only lawful but also constitutional, that statement would contradict several controlling Supreme Court precedents, as described below.

the VRA." *Id.* The Supreme Court affirmed a District Court order holding the plan unconstitutional because there was "no meaningful legislative inquiry" into "whether a new, enlarged District 1, created without a focus on race but however else the State would choose, could lead to § 2 liability." *Id.* at 304. Similarly, when North Carolina's Legislature instructed its mapmaker to draw 28 majority-Black state legislative districts, ostensibly to comply with the Voting Rights Act, a three-judge district court held that the Legislature's failure to analyze the third *Gingles* precondition doomed the redistricting plans, and the Supreme Court affirmed without argument and without dissent. *Covington v. North Carolina*, 316 F.R.D. 117, 167–69 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017). In *Abbott v. Perez*, the Texas Legislature contended that Section 2 required them to increase the Latino population of a state House district to more than 50%. 138 S. Ct. 2305, 2334 (2018). The Supreme Court held that the Legislature's evidence—that a Latino had only won one out of two primary elections in that district—was "too thin a reed to support the drastic decision to draw lines in this way," and held that the district was "an impermissible racial gerrymander." *Id.* at 2334–35. Finally, when the Wisconsin Supreme Court accepted a plan that created an additional majority-Black district without analyzing whether "a race-neutral alternative that did not add [another] majority-black district would deny black voters equal political opportunity," the U.S. Supreme Court summarily reversed; the time from the Wisconsin Supreme Court's

7

decision to reversal was just three weeks. *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245 (2022).

For these remedial proceedings, Dr. Duchin started with a plan expressly designed to have two majority-Black districts (Cooper Illustrative Plan 2), made certain changes, and settled on the VRA Plan, which "creates a new Congressional District 2 that is majority-Black by voting age population (VAP), by citizen voting age population (CVAP), and by active registered voters (ARPOP)." *In re Redistricting 2023*, ECF No. 7-3 (Duchin Report) at 1, 3. District 2 has a BVAP of 50.08%, while District 7 remains majority-Black, with a BVAP of 54.50%. *Id.* at 3. Both percentages are within 0.8 points of the BVAPs for those districts in Cooper Illustrative Plan 2. *Caster*, ECF No. 75 (Cooper Report) at 26.

The VRA Plan's focus on race manifests in the way it splits counties. In Jefferson County, District 6 and District 7 have roughly equal populations (46.3% of residents are in District 6, and 53.7% in District 7). But 81.5% of the Black population of Jefferson County is in District 7, meaning that the Black population of District 7 is 4.4 times as large as the Black population of District 6. This ratio is higher than one the Supreme Court found to be *prima facie* evidence of "stark racial borders." *Cooper*, 581 U.S. at 300 (because the goal of drawing a majority-minority district prevented the mapmaker from respecting county lines, "[t]he result is a district with stark racial borders: Within the same counties, the portions that fall

inside District 1 have black populations two to three times larger than the portions placed in neighboring districts."). In fact, this ratio is more than twice as high as the equivalent ratio in the enacted 2021 Plan (1.8). Yet the *Milligan* Plaintiffs claimed that the 2021 Plan was racially gerrymandered in Jefferson County, based on their own experts' analysis. *Milligan*, ECF No. 103 (Proposed Findings of Fact and Conclusions of Law) at 107–08. Similarly, the VRA Plan would split Mobile County for the first time in Alabama's history, with almost exactly half of its residents in District 1 and half in District 2. But the Black population of District 2 would be 2.5 times as high as the Black population of District 1, also within the range the Supreme Court found to be evidence of "stark racial borders." Finally, the VRA Plan divides Houston County for the first time in Alabama's history. The portion in District 1 is 16% Black, but the portion in District 2 is 54% Black, a dramatic difference.

The *Milligan* and *Caster* Plaintiffs' submission to the Special Master identifies no basis in evidence, much less a strong one, to conclude that the Voting Rights Act requires a plan that is designed to have two majority-Black districts, or one with gaping racial disparities within counties. Nor does such evidence exist, because race-neutral plans can create two opportunity districts. The Singleton Plan's Jefferson County district allows Black voters to elect candidates of their choice (and Black candidates in particular) most of the time, despite having a BVAP of 39.61%. *In re Redistricting 2023*, ECF No. 5 at 6–13. And the Singleton Plan's Black Belt

district has had a perfect record as an opportunity district with a BVAP of 49.38%. *Id.* Targeting a BVAP of 50% for both districts is arbitrary and unnecessary, and the *Singleton* Plaintiffs fear that a plan with these "non-negotiable" targets will suffer the same fate in the Supreme Court as similar plans in *Cooper*, *Covington*, *Abbott*, and *Wisconsin Legislature*.

In light of this precedent and these facts, the *Singleton* Plaintiffs struggle to understand why the *Milligan* and *Caster* Plaintiffs have chosen to put forward a remedial plan based on a specific racial target despite telling the Supreme Court that doing so is unnecessary. In the previous appeal, the *Milligan* Plaintiffs told the Supreme Court, "The decision below made clear that Alabama could remedy the § 2 violation here with *majority-white* crossover districts." *Allen v. Milligan*, No. 21-1086 (U.S.), Brief for *Milligan* Appellees at 22 (emphasis in original); *see also id.* at 44 ("But § 2 plaintiffs' plans are not the same as state-enacted remedies. While *Gingles* 1 requires a plaintiff to draw majority-minority districts, at the remedial stage, § 2 allows States to choose their own method of complying with the VRA, including drawing majority-White crossover districts.") (cleaned up). They cited one of the *Singleton* Plaintiffs' proposed remedial plans, which had no majority-Black districts, as "one option" for remedying the State's violation of Section 2. *Id.* at 44–45. Likewise, the *Caster* Plaintiffs assured the Supreme Court that there was "no reason to conclude that a remedy in this case would compel contorted districts or a

fixed racial percentage" because "the remedy for a §2 violation entails no predetermined, 'non-negotiable' racial target. A §2 remedy can be any plan that gives the minority group the *opportunity* to elect its favored candidate." *Allen v. Caster*, No. 21-1087 (U.S.), Brief for *Caster* Respondents at 26 (cleaned up) (emphasis in original).

The *Milligan* and *Caster* Plaintiffs' disregard of the *Cooper v. Harris* threshold inquiry facilitates the State's renewed attack on the VRA. In the first appeal, the Supreme Court rejected the Defendants' argument that the *Gingles* I precondition is unconstitutional because by definition it requires Section 2 plaintiffs to employ a racial target of 50%. Now, in its second appeal, the Secretary of State is asking the Supreme Court to rule that a court cannot constitutionally order an additional majority-Black district to remedy a violation of Section 2. But, in order to frame its contrived theory that focuses on communities of interest in District 2, the State once again is asking the Supreme Court to ignore the 2023 Plan's majority-Black District 7 that was created by dividing Jefferson County along racial lines, perpetuating the *Wesch v. Hunt* gerrymander ordered by a federal court a year before *Shaw v. Reno* was handed down. The *Milligan* and *Caster* Plaintiffs' contention that their racially targeted majority-Black districts are not subject to strict scrutiny assists the Secretary in his argument. But the Supreme Court has never held, or even suggested, that the racially targeted illustrative districts that must be drawn to

establish Section 2 liability can be adopted as remedial districts without further constitutional justification. If the Special Master points out to the District Court that the crossover districts in the Singleton Plan provide a complete remedy for the Section 2 violation, and thus that majority-Black districts cannot survive strict scrutiny, the State can be deprived of its cynical use of the enacted 2023 Plan as a vehicle for another attack on *Gingles*.

**B.    The Singleton Plan Outperforms the VRA Plan on Traditional Redistricting Principles.**

Even if the VRA Plan did not raise grave constitutional concerns, it would still suffer from another weakness: it compares unfavorably with the Singleton Plan on three of the four traditional redistricting principles the District Court listed in its order: compactness, respect for political subdivisions, and maintenance of communities of interest.[3]

*Compactness*

The following table compares the Reock and Polsby-Popper scores of the Singleton and VRA Plans. (Higher scores are better.)

| Plan | Reock | Polsby-Popper |
|---|---|---|
| Singleton Plan | 0.3869 | 0.2266 |
| VRA Plan | 0.3180 | 0.1939 |

By either measure, the Singleton Plan is more compact than the VRA Plan.

---

[3] The fourth principle is contiguity; the Singleton and VRA Plans are both contiguous.

*Respect for Political Subdivisions*

The Singleton Plan splits six counties, the minimum number required to create seven districts of equal population. The VRA Plan splits seven counties, and it does so more severely than the Singleton Plan. Below is a summary of how the county splits in each plan affect Alabamians. The number of affected people is calculated two ways. Measure 1 is the number of residents of split counties. Measure 2 is the number of residents of the less populous district within a split county (since small splits to counties should be favored over large splits).

| Plan | Measure 1 | Measure 2 |
|---|---|---|
| Singleton Plan | Elmore: 87,977<br>Escambia: 36,757<br>Lauderdale: 93,564<br>Shelby: 223,024<br>Talladega: 82,149<br>Tuscaloosa: 227,036<br>**Total: 750,507** | Elmore: 20,852<br>Escambia: 739<br>Lauderdale: 43,533<br>Shelby: 43,033<br>Talladega: 13,406<br>Tuscaloosa: 42,770<br>**Total: 164,333** |
| VRA Plan | Clarke: 23,087<br>Chilton: 45,014<br>Houston: 107,202<br>Jefferson: 674,721<br>Lauderdale: 93,564<br>Mobile: 414,809<br>Tuscaloosa: 227,036<br>**Total: 1,585,433** | Clarke: 5,547<br>Chilton: 3,143<br>Houston: 33,724<br>Jefferson: 312,627<br>Lauderdale: 43,533<br>Mobile: 206,077<br>Tuscaloosa: 42,770<br>**Total: 647,421** |

By Measure 1, the VRA Plan's county splits affect more than twice as many people as the Singleton Plan's. By Measure 2, the VRA Plan's county splits affect nearly four times as many people as the Singleton Plan's.

The VRA Plan's split of Houston County is particularly troubling. In southeast Alabama, District 2 reaches down from Henry County to grab part of the City of Dothan in Houston County, while leaving the rest of Houston County in District 1. According to the *Milligan* and *Caster* Plaintiff's submission, this was done to place the one plaintiff in *Milligan* who lives in Dothan into a Black Belt district. *In re Redistricting 2023*, ECF No. 7 at 7; *see also* ECF No. 7-3 (Duchin Report) at 1 ("I was able to keep all named Milligan plaintiffs—who I understand live in Dothan, Montgomery, and Mobile—in the Black Belt districts."). But Dothan is not in the Black Belt. Houston County is not in the Black Belt. Neither is Henry County. So the VRA Plan extends a Black Belt district deep into the Wiregrass, splitting more than 33,000 residents of Houston County from the rest of the county, to accommodate a single person's preference to vote in a Black Belt district. This is not a legitimate reason to split a county, especially when the result is to split more counties than necessary for population equality.

The VRA Plan also lacks respect for municipalities, creating major divisions in two of Alabama's four largest cities: Birmingham and Mobile. The Singleton Plan keeps Birmingham and Mobile whole.

*Maintenance of Communities of Interest*

The VRA Plan divides every community of interest that has been cited in this case. It cuts Jefferson County in half along racial lines. It divides the Black Belt so

that its rural residents in District 7 must compete with the far larger population of urban Birmingham for their Representative's attention, and its rural residents in District 2 must compete with urban Mobile. While the *Singleton* Plaintiffs still take no position on whether the Gulf Coast and Wiregrass are communities of interest that ought to be preserved in a remedial plan, the VRA Plan splits these communities as well. The table below lists the number of Alabamians who have been "stranded"—that is, they have been placed in a different congressional district from the majority of the members of their communities of interest.

| Plan | Stranded Alabamians |
|------|---------------------|
| Singleton Plan | Black Belt: 59,183<br>Jefferson County: 0<br>Gulf Coast: 0<br>Wiregrass: 0<br>**Total: 59,183** |
| VRA Plan | Black Belt: 153,855<br>Jefferson County: 312,627<br>Gulf Coast: 206,077<br>Wiregrass: 50,870<br>**Total: 723,429** |

The VRA Plan strands more than twelve times as many people as the Singleton Plan.[4]

---

[4] The *Singleton* Plaintiffs would like not to strand anyone, but it is impossible to create a district that includes Russell County with the rest of the Black Belt. *In re Redistricting 2023*, ECF No. 5 at 17 n.11.

*Retention of Districts from the 2021 Plan*

Although the principle of core retention was not listed among the criteria for the Special Master, the *Milligan* and *Caster* Plaintiffs state that the VRA Plan "adheres to the principle of core retention by mirroring 82.2% of the State's 2021 congressional plan and tracking the State's treatment of the Mobile region in the 2021 Board of Education plan." *In re Redistricting 2023*, ECF No. 7 at 7. Core retention is a problematic principle when the previous districts are unlawful and unconstitutional, as they are here; high core retention may be a sign that the remedial plan is unlawful and unconstitutional too. *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018) ("[E]fforts to protect incumbents by seeking to preserve the 'cores' of unconstitutional districts … have the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander …."), *aff'd in relevant part and reversed in part on other grounds*, 138 S. Ct. 2548 (2018); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n.8 (E.D. Va. 2016) ("In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a *Shaw* violation.").

Even if core retention is a legitimate goal, for the portions of the 2021 Plan unaffected by the Section 2 violation and the alleged racial gerrymander, the Singleton Plan preserves more of the cores of districts than the VRA Plan; the Singleton Plan keeps Districts 1, 4, and 5 intact, while the VRA Plan keeps only

16

Districts 4 and 5 intact. But in Jefferson County, which the *Singleton* and *Milligan* Plaintiffs both alleged to be racially gerrymandered, the VRA Plan's similarity to the 2021 Plan is a red flag. *Covington*, 138 S. Ct. at 2551 (enjoining districts that "retain[ed] the core shape" of previously racially gerrymandered districts, because the redrawn districts continued to bear the hallmarks of racial predominance).

In short, the VRA Plan does not perform as well as the Singleton Plan on any districting criteria the District Court has enumerated (except for contiguity, where both plans perform equally well). Therefore, the Special Master should recommend the Singleton Plan even if it concludes the VRA Plan is constitutional.

## II.    The Communities of Interest Plan

The *Singleton* Plaintiffs understand that the *Milligan* and *Caster* Plaintiffs have shown that since 2014, no Black candidate has received more votes than his or her opponent in a statewide race in District 2 of the Communities of Interest Plan, a streak of eleven losses.[5] On this basis, the *Singleton* Plaintiffs agree with the *Milligan* and *Caster* Plaintiffs that the Communities of Interest Plan does not remedy the Voting Rights Act violation and therefore cannot be implemented.

---

[5] Black candidates have been successful in the Singleton Plan, getting more votes in 8 of the last 12 elections in the Jefferson County district, and all 12 elections in the Black Belt district. *In re Redistricting 2023*, ECF No. 5 at 10–11.

### III.    The ADC Plan

The *Singleton* Plaintiffs appreciate the work of the Alabama Democratic Conference in proposing a remedial plan that provides two opportunity districts. But in trying to ensure equal opportunity, the ADC Plan goes too far, creating a severe racial gerrymander that splits almost twice as many counties as necessary and uses land bridges as narrow as half a mile wide to connect relatively Black precincts. This is the type of map the Supreme Court warned about in *Shaw*: "[R]edistricting legislation that is so bizarre on its face that it is unexplainable on grounds other than race demands the same close scrutiny that we give other state laws that classify citizens by race." 509 U.S. at 644 (cleaned up). The ADC Plan would trigger strict scrutiny, but the ADC's submission gives no indication of how the plan would survive it. If the District Court orders the ADC Plan, the Supreme Court would likely have no qualms about reversing.

### IV.    The Hillyer Plan

The Hillyer Plan appears to be well-intentioned, but it should not be recommended by the Special Master. It splits Jefferson County along racial lines, which is part of the basis of the *Singleton* claim, and it cracks the Black Belt across *five* congressional districts, exacerbating one of the main problems that gave rise to the *Milligan* and *Caster* claims.

18

## V.      The McCrary/Wolf Plans

McCrary/Wolf Plan A intentionally creates two majority-Black districts but acknowledges that doing so is unnecessary to remedy the Voting Rights Act violation, as McCrary/Wolf Plan B performs equally well with a district that is not majority-Black. *In re Redistricting 2023*, ECF No. 11 at 11–12. For the reasons above, such a plan cannot survive strict scrutiny.

McCrary/Wolf Plan B splits the two largest counties in Alabama: Jefferson and Mobile. As to communities of interest, it splits Jefferson County, the Black Belt, the Wiregrass, and the Gulf Coast between districts. It also does not avoid splitting precincts; while the Singleton Plan splits six precincts, the minimum number possible, McCrary/Wolf Plan B splits fifty-eight. *See Singleton*, ECF No. 191 at 212–13 (Reapportionment Committee redistricting guidelines stating that precincts may be communities of interest). Therefore, the Singleton Plan outperforms McCrary/Wolf Plan B on adherence to traditional districting principles.

## VI.     The Grofman/Cervas/Griggy Plans

The Grofman/Cervas/Griggy Plans both enforce a racial target of 50% Black Citizen Voting Age Population, without any evidence that this target is necessary to ensure compliance with the Voting Rights Act. Therefore, these plans are unconstitutional for the reasons described in Part I.A.

## VII.   Response to the Brennan Center's Brief

The *Singleton* Plaintiffs appreciate the thoughtful analysis of the Brennan Center for Justice, but much of it is mistaken.

First, the Brennan Center's brief says that the *Singleton* Plaintiffs "contend that dividing certain counties in a plan would result in an unconstitutional racial gerrymander." *In re Redistricting 2023*, ECF No. 20-1 at 2 ("Brennan Brief"). That is incorrect. The *Singleton* Plaintiffs contend that dividing counties *according to race*, as the VRA Plan does, results in an unconstitutional racial gerrymander if it is not sufficiently justified. And because a race-neutral plan exists that remedies the Voting Rights Act violation, the racial gerrymander is not justified. The *Singleton* Plaintiffs disapprove of county splits that are larger than necessary, but they highlight those splits in the context of their claim that the VRA Plan underperforms on adherence to traditional redistricting principles, not their claim that the VRA Plan is unconstitutional. Moreover, the Brennan Center is too quick to dismiss the importance of counties just because the Alabama Constitution does not require them to be kept whole in congressional districts. Counties were kept whole in Alabama's congressional plans from statehood until 1965; after 1965, counties were only ever split to equalize population between districts and to gerrymander Black voters into District 7. At the first preliminary injunction hearing, the *Singleton* Plaintiffs

presented ample evidence of the importance of counties in Alabama's civic life. *In re Redistricting 2023*, ECF No. 5 at 15–16.

The Brennan Center then discusses the Supreme Court's gerrymandering jurisprudence in support of its contention that its preferred remedy—"a map with two *majority* Black districts"—is constitutional. Brennan Brief at 2–5 (emphasis in original). But the brief does not mention three of the four recent precedents in which the Supreme Court struck down majority-minority districts for being insufficiently justified (*Covington*, *Abbott*, and *Wisconsin Legislature*), and it mentions the other (*Cooper*) only in passing. It is not possible to discuss the constitutionality of a district designed to be majority-minority without addressing these cases. Moreover, the Brennan Center's main argument, that aggregating minority voters is constitutional unless they are subject to a "haphazard grouping" or the majority-minority district is "bizarrely shaped," Brennan Brief at 3–4, was squarely rejected in *Miller v. Johnson*: "Our observation in *Shaw* of the consequences of racial stereotyping was not meant to suggest that a district must be bizarre on its face before there is a constitutional violation." 515 U.S. 900, 912 (1995).

The Brennan Center then discusses a performance analysis, which shows that in both the Singleton and VRA plans, the preferred candidates of Black voters went a perfect 15 for 15 in both of their opportunity districts in elections from 2016 to 2020. Brennan Brief at 6. But perfection is apparently not good enough; the Brennan

Center warns against adopting the Singleton Plan because Black-preferred candidates in its District 7 "would win an average vote share of 56 percent," while candidates in the VRA Plan's District 7 would win "nearly 68 percent." *Id.* at 8. Eschewing a solid 12-point win for a 36-point landslide sounds like an attempt to guarantee victory for Black-preferred candidates, something the Voting Rights Act does not do. *In re Redistricting 2023*, ECF No. 5 at 7–8. Increasing the Black population of a district to extend the margins of victory for Black-preferred candidates, rather than to create an opportunity for them, is exactly what the Supreme Court condemned in *Cooper v. Harris*. 581 U.S. at 302–03.[6]

Finally, the Brennan Center faults the Singleton Plan for including fewer Black voters in its two opportunity districts than the VRA Plan does. Brennan Brief at 8–9. Because all districts are equal in population, what the Brennan Center is really saying is that a plan that packs Black voters into a state's opportunity districts is better than one that doesn't; the more Black voters it packs, the better. Unsurprisingly, this section of the brief cites no authority supporting its claim that race-based packing is for the best. Moreover, this claim contradicts the theory of the case in *Milligan* and *Caster*. *Milligan*, ECF No. 1 (Complaint) at 2 (faulting the

---

[6] Ironically, the Brennan Center predicts, based on data from 2016 to 2020, that the VRA Plan "provide[s] greater assurance that the opportunity to elect in both [of its opportunity] districts will be consistent and effective." Brennan Brief at 8. That prediction was wrong; the Singleton Plan provided more opportunity in the 2022 election than the VRA Plan. *See infra* Part VIII.

Legislature for packing District 7 without determining whether doing so was necessary to satisfy the VRA); *Caster*, ECF No. 1 (Complaint) at 24 ("During the 2010 redistricting cycle, Alabama packed the state's existing majority-Black legislative districts with many more Black voters."). Packing for packing's sake is not a constitutional reason to move voters in and out of districts based on their race.

## VIII.  Response to the Campaign Legal Center's Brief

The Campaign Legal Center, whose proposed remedial plan in the appeal of *Milligan* and *Caster* is now the Singleton Plan, submitted a brief in which they urge the Special Master to evaluate how the Singleton Plan's opportunity districts performed in the 2022 election. *In re Redistricting 2023*, ECF No. 13 ("CLC Brief"). As the *Singleton* Plaintiffs have already shown, that performance was excellent. In the Singleton Plan's Jefferson County district, Black candidates won more votes in four of the five statewide elections. *In re Redistricting 2023*, ECF No. 5 at 10. The candidate who lost was a political newcomer with few resources who took on a popular incumbent governor, and even she received more than 49% of the vote. *Id.* at 11. In the Singleton Plan's Black Belt district, all five Black candidates won more votes, consistent with that district's historical performance. *Id.* at 10. If the 2022 election returns are "more probative" than others, as the CLC claims, CLC Brief at 1, then the Singleton Plan creates more opportunity than the VRA Plan because only three of the five Black candidates in the VRA Plan's District 2 received more

votes.[7] In fact, the Black candidate received a higher share of the votes in the Singleton Plan's Jefferson County district than in the VRA Plan's District 2 in three of the five elections.[8] Focusing on the 2022 election further confirms that the Singleton Plan completely remedies the Voting Rights Act violation.

The CLC also says that the VRA Plan is not a racial gerrymander and may be adopted as a remedy because the District Court held that race did not predominate in its creation, and the Supreme Court affirmed that finding. CLC Brief at 5. First, the CLC is wrong about the Supreme Court's holding. The portion of the Chief Justice's opinion that the CLC cites was not joined by Justice Kavanaugh; a majority of the Supreme Court did *not* agree that race did not predominate in the creation of the plans on which the VRA Plan is based. *Allen v. Milligan*, 143 S. Ct. 1487, 1511 (2023) (plurality opinion); *id.* at 1527 (Thomas, J., dissenting) ("the illustrative maps here are palpable racial gerrymanders"). Second, the CLC makes the same mistake as the *Milligan* and *Caster* Plaintiffs by eliding the crucial distinction between

---

[7] The CLC also states that because the Supreme Court rejected the Defendants' argument, "CLC's illustrative plans are not an obvious starting place for a remedial plan." CLC Brief at 3. The CLC's plan is an obvious starting point because it is an excellent plan; it creates two opportunity districts and outperforms the VRA Plan in nearly every way, all without focusing on race. The CLC's reasons for advancing its plan are irrelevant; the plan's results speak for themselves.

[8] In summary: Governor: 49.1% in Singleton v. 48.5% in VRA; Senate: 50.6% v. 49.6%; Attorney General: 50.7% v. 50.2%; Secretary of State: 50.4% v. 50.8%; Associate Justice: 50.8% v. 50.9%. These figures are in the spreadsheets provided to the Special Master by the Singleton Plaintiffs and the Supplemental Remedial Report of Baodong Liu, Ph.D., *In re Redistricting 2023*, ECF No. 7-2 at 4.

illustrative plans and remedial plans. *See supra* Part I.A. It is surprising that the CLC would forget about this distinction, which it explained for several pages in its Supreme Court *amicus* brief. Just after the section of its brief called "Illustrative *Gingles* 1 maps are not the same as a remedial map," the CLC said, "In fact, equal protection concerns may arise where the jurisdiction fails to exercise this careful discretion to consider crossover districts and instead inflexibly acts as if it must hit certain racial population quotas in a Section 2 district." Brief of *Amicus Curiae* Campaign Legal Center in Support of Appellees and Respondents, *Merrill v. Milligan*, Nos. 21-1086 & 21-1087, 2022 WL 2898313 at 15, 20 (U.S. July 18, 2022). The VRA Plan inflexibly acts as if it must hit certain racial population quotas in a Section 2 district—namely, 50% BVAP. Thus, equal protection concerns arise, and they are serious.

Finally, the CLC defends the VRA Plan's districts on the grounds that they are not as ugly as the districts at issue in *Cooper* and *Abbott*. CLC Brief at 6–7. Ugliness is not required for a plan to be unconstitutional. *Miller*, 515 U.S. at 912. And the *Singleton* Plaintiffs don't worry about the constitutionality of the VRA Plan because of its looks; they worry because of the *Milligan* and *Caster* Plaintiffs' statements (and the statements of their experts) about how it was created, and the way in which it uses race to divide counties. And whether or not the VRA Plan is constitutional, the *Singleton* Plaintiffs have shown that the Singleton Plan

outperforms the VRA Plan on the criteria the District Court has ordered the Special Master to use. The CLC should be proud that it created the superior plan.

## CONCLUSION

The Singleton Plan is superior to any other proposed plan under the criteria set out by the District Court. But the most important point is that no plan that divides Alabamians by race can be constitutional because the Singleton Plan demonstrates that two performing crossover opportunity districts can be created without splitting counties along racial lines. There seems to be a pervasive assumption that the District Court and the Supreme Court have commanded—or at least authorized—one or more remedial districts to be majority-BVAP without having to survive strict scrutiny. Thirty years of Supreme Court precedent, from *Shaw v. Reno* to *Wisconsin Legislature v. Wisconsin Elections Commission*, say otherwise.

Their constitutional problems aside, the majority-Black plans presented to the Special Master reveal no principled way to choose among them. The Singleton Plan not only meets constitutional requirements, but it provides a principled format for drawing future redistricting plans. Instead of chasing racial populations around the map of Alabama every ten years, the Legislature should begin with whole counties to see if Section 2 can be satisfied without resorting to districts with racial targets. Redistricting should be about aggregating local political communities, which is what Alabama did for a century and a half. When that process creates effective

opportunity districts for racial minorities without having to resort to racial targeting, it should be celebrated.

Dated: September 13, 2023                    Respectfully submitted,

                                             /s/ Henry C. Quillen
                                             Henry C. Quillen
                                             (admitted *pro hac vice*)
                                             WHATLEY KALLAS, LLP
                                             159 Middle Street, Suite 2C
                                             Portsmouth, NH  03801
                                             Tel: (603) 294-1591
                                             Fax: (800) 922-4851
                                             Email: hquillen@whatleykallas.com

                                             Joe R. Whatley, Jr.
                                             W. Tucker Brown
                                             WHATLEY KALLAS, LLP
                                             2001 Park Place North
                                             1000 Park Place Tower
                                             Birmingham, AL 35203
                                             Tel: (205) 488-1200
                                             Fax: (800) 922-4851
                                             Email: jwhatley@whatleykallas.com
                                                       tbrown@whatleykallas.com

                                             /s/ James Uriah Blacksher
                                             James Uriah Blacksher
                                             825 Linwood Road
                                             Birmingham, AL 35222
                                             Tel: (205) 612-3752
                                             Fax: (866) 845-4395
                                             Email: jublacksher@gmail.com

                                             Myron Cordell Penn
                                             PENN & SEABORN, LLC
                                             1971 Berry Chase Place

Montgomery, AL 36117
Tel: (334) 219-9771
Email: myronpenn28@hotmail.com

Diandra "Fu" Debrosse Zimmermann
Eli Hare
DICELLO LEVITT LLP
505 20th Street North, Suite 1500
Birmingham, AL 35203
Tel.: (205) 855.5700
Email: fu@dicellolevitt.com
 ehare@dicellolevitt.com

U.W. Clemon
U.W. Clemon, LLC
Renasant Bank Building
2001 Park Place North, Tenth Floor
Birmingham, AL 35203
Tel.: (205) 506-4524
Fax: (205) 538-5500
Email: uwclemon1@gmail.com

Edward Still
2501 Cobblestone Way
Birmingham, AL  35226
Tel: (205) 335-9652
Fax: (205) 320-2882
Email: edwardstill@gmail.com

***Counsel for Singleton Plaintiffs***