UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BOBBY SINGLETON, *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> WES ALLEN, *in his official capacity as Alabama Secretary of State*, *et al.*, <br><br>    Defendants. | Case No.: 2:21-cv-1291-AMM <br><br> **THREE-JUDGE COURT** |
| EVAN MILLIGAN, *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> WES ALLEN, *in his official capacity as Alabama Secretary of State*, *et al.*, <br><br>    Defendants. | Case No.: 2:21-cv-1530-AMM <br><br> **THREE-JUDGE COURT** |
| MARCUS CASTER, *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> WES ALLEN, *in his official capacity as Secretary of State of Alabama*, *et al.*, <br><br>    Defendants. | Case No.: 2:21-cv-1536-AMM |

**WRITTEN RESPONSE BY
THE SPECIAL MASTER**

**BEFORE THE SPECIAL MASTER:**

I. **<u>INTRODUCTION</u>**

On September 25, 2023, the Special Master filed with the Court three proposed remedial plans for Alabama's U.S. congressional map and a Report and Recommendation. (Doc. # 44-46).[1] On September 28, 2023, eight groups of interested parties and non-parties submitted comments regarding the Special Master's proposed remedial plans:

1. Non-party Quin Hillyer (Doc. # 48);
2. The *Singleton* Plaintiffs (Doc. # 49);
3. Defendant Secretary of State Wes Allen (Doc. # 50);
4. Defendants Rep. Chris Pringle and Sen. Steve Livingston (Doc. # 51);
5. *Amicus Curiae* the Brennan Center for Justice at New York University School of Law (Doc. # 52);
6. The *Milligan* Plaintiffs (Doc. # 53);
7. Non-party the Alabama Democratic Conference ("ADC");[2] and
8. The *Caster* Plaintiffs.[3]

The Special Master has reviewed and carefully considered these comments, and again commends the parties and non-parties on the high quality and thoughtful analysis reflected in the comments, which were necessarily completed on an expedited basis.[4]

On September 29, 2023, the Court issued an Order directing the Special Master to file a written response to the following question by 10:00 a.m. CDT on October 2, 2023:

> In light of the comments of the *Milligan* and *Caster* Plaintiffs, as well as those of the Alabama Democratic Conference, does the Special Master's Second Proposed

---

[1] The Report and Recommendation was filed in all three of the above-captioned dockets as well as the miscellaneous docket in *In re Redistricting 2023*, 2:23-mc-01181-AMM (N.D. Ala.). For simplicity, this Written Response uses the citation to the filings in the miscellaneous docket, where available, and such filings are designated as "(Doc. # __)."

[2] The ADC's comments were not filed on the miscellaneous docket but instead were filed on the *Milligan* docket at (Doc. # 305). *Milligan v. Allen*, 2:21-cv-01530 [Dkt. No. 305].

[3] The *Caster* Plaintiffs' comments were not filed on the miscellaneous docket but instead were filed on the *Caster* docket at (Doc. # 248). *Caster v. Allen*, 2:21-cv-01536 [Dkt. No. 248].

[4] Mr. Hillyer's comments identify an error in the Report and Recommendation. Hillyer Comments ¶ 5. Page 40 of the Report and Recommendation incorrectly states that Mr. Hillyer's plan splits 46 voting districts. Instead, this language should say that McCrary Plan A splits 46 voting districts, not the Hillyer Plan.

Plan provide an opportunity for Black voters in CD2 to elect their preferred candidate? Put differently, does CD2 in the Second Proposed Plan fully remediate the vote dilution infirmity we identified in our 2022 and 2023 preliminary injunction orders?

The Special Master files this Written Response to address the Court's question. As explained below, each of the Special Master's three proposed remedial plans includes two districts (Districts 2 and 7) in which the Black-preferred candidate often wins the election. Although the number of election contests in each district that the Black-preferred candidate would have won, and the average percentage margin of victory, varies among the three plans, each of the plans, including Remedial Plan 2, creates "an additional district in which Black voters have an opportunity to elect a representative of their choice." SM Order at 7. Therefore, all three plans, including Remedial Plan 2, would remedy the likely Section Two violation previously identified by the Court.

## II. ANALYSIS

The Court directed each proposed plan to "[c]ompletely remedy the likely Section [Two] violation identified in this Court's order of September 5, 2023." SM Order at 7. "To that end, each proposed map shall include either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Id.* (internal quotation marks and citations omitted).

As the Court noted, performance analyses are commonly used to evaluate Section Two remedial plans. PI Order at 133. A performance analysis assesses whether, using recent election results, a group's preferred candidate would be elected from a proposed opportunity district. While there is no "baseline level at which a district must perform to be considered an 'opportunity' district," there is a "'denial of opportunity in the real sense of that term'" if a "cohesive majority will 'often, if not always, prevent' minority voters from electing the candidate of their choice in the purportedly remedial district." *Id.* at 133-34 (quoting *League of United Latin Am. Citizens v.*

*Perry*, 548 U.S. 399, 427, 429 (2006)). Accordingly, a performance analysis in this case should demonstrate that the Black-preferred candidate often would win an election in the subject district, recognizing that "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success" in every race. *Perry*, 548 U.S. at 428 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11(1994)). Further, a voting district with less than a majority of Black voters can be an effective opportunity district. *See, e.g.*, *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 716-17 (S.D. Tex. 2013) (describing how voting district with less than a majority of Black voters has operated as effective opportunity district since 1980), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015).

The Special Master acknowledges, as he did in his initial Report and Recommendation, that the proposed plans offer a range of performance levels, and that the performance of the Black-preferred candidate in District 2 is slightly weaker in Remedial Plan 2 than in Remedial Plans 1 and 3, with an average margin of victory across seventeen election contests of +8.2%, compared to +10.3% for Remedial Plans 1 and 3. *See* Report and Recommendation, p. 3, Table 4 (District 2). In other words, the District 2 Black-preferred candidate in Remedial Plan 2, on average, would perform roughly two percentage points below their performance in the other two plans, but still would be expected to win most election contests.

That two percentage point difference would have changed the outcome of several 2022 elections in District 2 in Remedial Plan 2, but not in Remedial Plans 1 and 3. Nonetheless, and considering the points below, the Special Master reaffirms that District 2 in Remedial Plan 2 would be an effective opportunity district.

3

a.   **Voter Turnout**

Statewide voter turnout in the 2022 general election was the lowest in the past 36 years.[5] Table 1 shows the statewide voter turnout in general elections over the past 10 years, together with the average margin of victory of the Black-preferred candidate among the seventeen analyzed election contests.[6] The performance of the Black-preferred candidate in District 2 in all three remedial plans appears to correlate positively with voter turnout.[7]

**Table 1**
**Statewide Voter Turnout and**
**Average Margin of Victory in District 2**

| General Election Year | 2014 | 2016 | 2018 | 2020 | 2022 |
|---|---|---|---|---|---|
| Voter Turnout | 39.9% | 66.8% | 49.9% | 62.8% | 38.6% |
| **District 2 Performance** | | | | | |
| Remedial Plan 1 | +6.47% | -- | +15.22% | +14.95% | +0.30% |
| Remedial Plan 2 | +4.73% | -- | +13.12% | +12.25% | -1.78% |
| Remedial Plan 3 | +5.83% | -- | +14.93% | +14.75% | +0.93% |

Turnout in 2022 was particularly poor among Democrats, which is relevant because the Black-preferred candidate was generally the Democrat in these contests. Table 2 shows that while the number of straight Republican ballots cast in the last two non-presidential general elections

---

[5] John Sharp, *Alabama's Midterms Had Lowest Turnout in at Least 36 Years*, Governing.com (Nov. 9, 2022) (https://www.governing.com/now/alabamas-midterms-had-lowest-turnout-in-at-least-36-years).

[6] Consistent with the approach taken in the Report and Recommendation, where Dr. Hood and Dr. Liu assessed the same election contest, the margin of victory from Dr. Hood's data set was used to calculate an average. Turnout data comes from the Alabama Secretary of State's website. Election Data Downloads, Alabama Secretary of State (https://www.sos.alabama.gov/alabama-votes/voter/election-data).

[7] *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 301 F. Supp. 3d 1297, 1325 (M.D. Ga. 2018) (explaining how turnout affects performance in district), *aff'd* 979 F.3d 1282 (11th Cir. 2020).

(2018 and 2022) was virtually unchanged, the number of straight Democrat ballots fell significantly, supporting the conclusion that Democrats had weaker turnout than Republicans in 2022.[8]

**Table 2**
**Straight Party Ballots Cast (Statewide)**

| General Election Year | 2018 | 2022 | Change |
|---|---|---|---|
| Straight Republican Ballots Cast | 663,269 | 648,953 | -2.2% |
| Straight Democrat Ballots Cast | 462,065 | 298,434 | -54.8% |
| Statewide Voter Turnout | 49.9% | 38.6% | -29.3% |

At the same time, however, District 2 in Remedial Plan 2 performed well in other non-presidential election years, including 2014 and 2018 when voter turnout was better than in 2022 but not unusually high. In other words, as long as voter turnout is not exceptionally low, as it was in 2022, one should expect the Black-preferred candidate to prevail in District 2.

    b.    **Candidate Resources**

The lack of competitive Democratic candidates for statewide office likely contributed to the low voter turnout in 2022.[9] As summarized in Table 3, while the 2018 Democratic nominee for Governor, Tuscaloosa mayor Walt Maddox, spent $2,570,968 on his challenge to Republican Governor Kay Ivey,[10] the 2022 Democratic nominee, Yolanda Flowers, spent just $12,726 and

---

[8] Election Data Downloads, Alabama Secretary of State (https://www.sos.alabama.gov/alabama-votes/voter/election-data).

[9] John Sharp, *Alabama's Midterms Had Lowest Turnout in at Least 36 Years*, Governing.com (Nov. 9, 2022) (https://www.governing.com/now/alabamas-midterms-had-lowest-turnout-in-at-least-36-years).

[10] This spending data is taken from expenditure reports for Mr. Maddox's principal candidate committee in 2018, through the Secretary of State's Electronic Fair Campaign Practices Act (FCPA) Reporting System. Alabama Electronic Fair Campaign Practices Act (FCPA) Reporting System (https://fcpa.alabamavotes.gov/PublicSite/Homepage.aspx) (taken from search for expenditures in the 2018 Governor's race).

was outspent by Governor Ivey 850:1.[11]  The election results corresponded with this spending disparity.

Table 3
**Performance and Funding of Democratic Candidates for Governor**

| General Election Year | **2018** | **2022** |
|---|---:|---:|
| Campaign Spending | $2,570,968 | $12,726 |
| Statewide Margin of Victory (or Defeat) | -19.1% | -37.7% |
| Remedial Plan 2, District 2 Margin of Victory (or Defeat) | +11.2% | -4.7% |

A local candidate for Congress with a competitive chance to win an election can be expected to attract more resources locally and nationally and encourage better turnout, performing better than an underfunded statewide candidate who is not expected to win against a popular incumbent.  Indeed, both the Republican and Democratic national congressional committees put significant resources into the most competitive races.[12]

    c.    **Biracial Elections**

The Special Master used seventeen total election contests from Drs. Hood and Liu for his election performance analysis.  Dr. Liu's set of elections is limited to eleven biracial election contests in which the Black-preferred candidate is Black.  The parties took different positions on the probative value of biracial elections versus non-biracial elections (in which the Black-preferred candidate is white) in the liability phase of these proceedings.  *See, e.g.*, *Singleton v. Merrill*, 582

---

[11] *See* Alabama Electronic Fair Campaign Practices Act (FCPA) Reporting System (https://fcpa.alabamavotes.gov/PublicSite/Homepage.aspx) (taken from search for expenditures in the 2022 Governor's race); *see also Singleton* Plaintiffs' Proposed Plan (Doc. # 5), at 11.

[12] DCCC Announces 2023-2024 Districts In Plan, DCCC (Apr. 3, 2023) (https://dccc.org/dccc-announces-2023-2024-districts-in-play/) and RNCC Announces 37 Offensive Pick-Up Opportunities to Grow GOP House Majority, RNCC (Mar. 13, 2023) (https://www.nrcc.org/2023/03/13/nrcc-announces-37-offensive-pick-up-opportunities-to-grow-gop-house-majority/).

F. Supp. 3d 924, 967 (N.D. Ala. 2022) (explaining that Dr. Liu examined biracial endogenous elections "based on case law indicating that evidence about biracial elections and endogenous elections is more probative of racially polarized voting than is evidence about other kinds of elections").

In the remedial phase, however, the issue is moot, for analyses of both the set of eleven biracial elections and the larger set of seventeen elections reach the same conclusion: as summarized in Table 4, the Black-preferred candidate wins the majority of contests over the past decade, while closely losing the 2022 contests.

Table 4
Performance of Remedial Plan 2 District 2
(with Average Margin of Victory)

| **Election Contest Set** | **2014-2022** | **2022 Only** |
|---|---|---|
| Eleven Biracial Election Contests | 7 of 11 (+4.6% average) | 1 of 5 (-1.7% average) |
| Seventeen Election Contests | 13 of 17 (+8.2% average) | 1 of 5 (-1.7% average) |

d.   **Recency of Elections**

The 2022 general election is the most recent general election available for a performance analysis. All other things being equal, a more recent election should be more probative than an older election.[13] As explained above, however, the circumstances surrounding these elections are not equal. A less competitive slate of Democratic nominees for statewide office in 2022, who

---

[13] *See, e.g.*, *Alabama State Conference of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1274 (M.D. Ala. 2020) (explaining that "the probativeness of an election in the § 2 analysis is highly dependent upon the individual facts and the nature of the local electorate" and therefore "a court may assign more probative value to elections that include minority candidates, than elections with only white candidates; it may consider endogenous elections more important than exogenous elections; or it may conclude that *recent elections are more probative* than those which occurred long before the litigation began") (emphasis added) (quoting *Solomon v. Liberty Cnty. Com'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000)).

were dramatically underfunded, contributed to depressed voter turnout, particularly among Democrats, thus tipping the balance of those candidates in District 2.

In fact, 2022 is the only general election analyzed in which a Black-preferred candidate would have lost District 2 in Remedial Plan 2. Even in 2014, which was the lowest statewide turnout since 1986 until the 2022 election,[14] the Black-preferred candidate won all three biracial election contests in District 2 in Remedial Plan 2. In 2018, when voter turnout reached almost 50%—although still below presidential election-year turnout percentages—the Black-preferred candidate won District 2 handily. This supports the conclusion that 2022 was an historic aberration.

### III.   CONCLUSION

As detailed above, while performance numbers vary across the three proposals—a factor to consider in comparing the plans to one another—each of the three remedial plans proposed by the Special Master, including Remedial Plan 2, creates "an additional district in which Black voters have an opportunity to elect a representative of their choice," and each would therefore remedy the likely Section Two violation the Court identified. SM Order at 7.

**SUBMITTED** this 2nd day of October, 2023.

/s/ Richard F. Allen
**RICHARD F. ALLEN**
**SPECIAL MASTER**

---

[14] John Sharp, *Alabama's Midterms Had Lowest Turnout in at Least 36 Years*, Governing.com (Nov. 9, 2022) (https://www.governing.com/now/alabamas-midterms-had-lowest-turnout-in-at-least-36-years).